STATE OF IOWA, Appellee v. FORREST DILLMAN, Appellant.

HOMICIDE: Self-Defense—Duty to Retreat. Defendant's failure
1   to avail himself of reasonable opportunity to retreat, and thereby avoid the killing, is quite persuasive on the question whether a jury question as to murder has been made out by the State. Evidence held to present a jury question, though deceased was of superior size, was drunk, was quarrelsome, but was unarmed.

JURY: Voir Dire—Effect of Evidence. A juror may not be asked,
2   on *voir dire*, as to the effect which certain contemplated evidence will have on his mind.

CRIMINAL LAW: Other Offenses. A witness may not, on cross-
3   examination, be interrogated as to offenses alleged to have been committed by an accused, which offenses are separate and distinct from the one under investigation, and which were in no manner brought out on direct examination.

WITNESSES: Depraved Habits, Antecedents, Etc. The right, *on*
4   *cross-examination*, to delve into the past depraved habits, antecedents, and character of a witness, by inquiry as to specific acts, in order to undermine his credibility, may always be car-

ried as far into his past life as the examiner would be permitted to go were he inquiring as to reputation for truth or moral character. It seems to be an abuse of discretion for the court to permit a 'more remote inquiry, unless the remote facts inquired about have some fair relation to the material facts in issue. An inquiry into facts occurring eight years previous to the occurrence under consideration, with no showing of nonreformation during said following eight years, held too remote.

*Appeal from Lee District Court.*—W. S. HAMILTON, Judge.

JUNE 24, 1918.

THE indictment charged defendant with having committed the crime of murder in the first degree. He was found guilty of murder in the second degree, and sentenced accordingly. He appeals.—*Reversed.*

*John E. Craig,* for appellant.

*H. M. Havner,* Attorney General, *J. M. C. Hamilton,* County Attorney, and *E. W. McManus,* Deputy County Attorney, for appellee.

LADD, J.—I. At about 9 o'clock in the evening of September 23, 1916, defendant shot and killed Ed Scarlett. To the indictment charging him with having committed murder in the first degree, he interposed the plea

1. HOMICIDE: self-defense: duty to retreat. that the shooting was in self-defense. Several errors are assigned, and among these, that the evidence was not sufficient to sustain the verdict, and that, in any event, it should have been for manslaughter only.

The evidence tended to show that, shortly after 8 o'clock in the evening, the defendant and his wife walked over to the residence of her mother, Mrs. Miranda, who was keeping a boarding house, and, while they were seated in the kitchen, decedent, Ed Scarlett, accompanied by one Schneider, came to the house; that they had had three drinks each at Jerry Stack's before coming; that, as Scarlett en-

tered, he remarked that he was hunting trouble, and suggested a fight with Mrs. Ellis,—who was making her home with her mother, Mrs. Miranda,—and then with the latter; that, as both declined, he walked into the kitchen, where defendant's wife offered him a chair; that he immediately returned to the front room, where he denounced those present in the vilest language; that Mrs. Miranda requested him to leave, which he at first declined to do, but was finally induced to do by Schneider, assisted by Mrs. Ellis; that defendant and his wife left immediately afterwards; that Mrs. Miranda overtook them, and requested defendant "to go over on Main Street and see if you can find the police for me;" that he went over that way; that, as Scarlett and Schneider went across the street from Mrs. Miranda's house, they noticed Mrs. Miranda and defendant's wife, when Scarlett remarked, "There is more of them from up at that house, and I am going over to hammer Hell out of them;" that, when they came up, a discussion arose as to the language Scarlett had employed at the house, one or both of the women insisting that he ought not to have made use of the names he did; that he denied having called them names; that defendant then came up, and remarked that he did call them the names. According to Mrs. Miranda, Scarlett then "struck at Forrest (defendant). He had something in his hand, and Forrest staggered back towards them. I am not going to say that he hit him, but he surely must have, for Forrest staggered back against me. I stepped back out of the way and started to run, and the shot was fired."

Schneider testified that defendant's wife accused Scarlett of calling her a whore, whereupon Scarlett said, "You're a damned liar;" and that defendant interposed, "You're a damned liar,—you did, and I am going to take a poke at you;" that Scarlett undertook to strike him, when defendant shot; that he did not see the shot fired, but, as he ran, heard it; that he did not see anything in Scarlett's hand when he

raised it to strike defendant, but that Scarlett raised his hand, and was plainly preparing to strike defendant. Defendant's wife's story of the transaction is not essentially different from her mother's; for she swore that, as defendant came up, decedent declared that "whoever said I cussed everybody in the house is a G—D— liar;" that her husband remarked, "Yes, Ed. you cussed everybody in the house;" that thereupon, decedent, using a vile name, said, "I fix you right now," and struck at defendant. The witness was unable to say whether he hit defendant, but declared that he attempted to strike again, when she heard a shot fired. The defendant's version of the affair was that, as he returned to where the parties were standing, he "stepped around in front of them about 3 feet from him;" that decedent said, "I never called you that. Whoever said I did is a G—D— lying s— of a b—," — to which he replied, in a kindly manner, "Ed, you did call them all names;" that decedent stood looking at him probably 10 seconds; that he, defendant, turned with his left side towards decedent, and was not looking when Scarlett struck him.

"I got the full force of the blow. He struck pretty hard, and I had the welt from it until the next morning. He knocked me back three feet, and I took a couple of staggering steps backward and staggered into my mother-in-law, and he said, 'You son-of-a-bitch, I'll fix you;' and the first thing that popped into my mind, when I seen that he hit me and I staggered that way, was that he was coming at me with some weapon,—his hand was back here, just like this. I could not see whether it was in his hip pocket or not, and he made one step at me, and the first law of nature entered my mind. I knew he was a big man. I knew I was just like a baby attacked by an elephant, attacked by a man like him, and I knew that, if he got close enough to me to get in one of his blows, he would knock me out or injure me very badly, if not kill me; and I pulled the gun out of my right-hand coat pocket and shot him. I

shot at him. I didn't know that I hit him. I didn't know that he was dead till 12 o'clock that night. I was starting to take hold of my wife's arm to take some bundles that she was holding, and said, 'Let's go.' When I got up there, I had no purpose or intention of injuring Ed Scarlett. I never thought anything about it. My sole idea was to get away. and get my wife away. I saw him stagger and fall. I did not know how badly he was hurt. I was panic-stricken, and the first thing that entered my mind was the idea or impulse to get away. I did not go home. I went to Alexandria."

The accused went on to St. Louis, where he went under an assumed name for some weeks, when he was arrested and brought back for trial. The defendant's weight at the time was 121 pounds, while that of Scarlett was 176 pounds or more. The evidence was in conflict as to whether Scarlett was peaceable and quiet, or a quarrelsome man, and a like conflict appears as to the character of the accused. The record is silent as to whether any attempt to retreat was made. From this evidence, it cannot be said that there was no evidence on which to base a finding that defendant was guilty of murder in the second degree. Manifestly, decedent was under the influence of liquor, and was out for trouble. But he was without weapon of any kind. His superior size and strength, though indicating that he might prove formidable in an encounter, did not establish conclusively that the accused might not have evaded this by retreat. Indeed, the disparity in the size of the men was suggestive that the larger would not be likely to deem resort to weapons necessary. The circumstances were such that the jury might have rejected the plea of self-defense interposed, and have found that, in view of decedent's drunken condition, defendant might have avoided taking his life by retreating; and that he was actuated by malice, induced by the outrageous language to his wife immediately preceding the shooting, and to her mother and sister at the house. The evidence was sufficient to carry the issue to the jury.

II. In the examination of George Wertz on *voir dire*, counsel for defendant asked, "Would the fact that the defendant ran away after the shooting prejudice your mind in any way?" An objection as incompetent, immaterial, and irrelevant was sustained, and, as we think, properly so. It appeared that, immediately after the shooting, the defendant went to Alexandria, Missouri, and then on to St. Louis, of the same state, where he went under an assumed name, until arrested and brought back for trial. To test the qualifications of persons called to sit as jurors, neither party may inquire concerning his views of evidence to be adduced on the trial, or the weight he would be inclined to attach thereto. These are matters on which the jurors are to act under the guidance of the court. In any event, the juror is to be guided by the court as to the consideration he must accord the testimony adduced; and, through expressions extracted from him in examination on *voir dire*, guidance by the court should not be rendered more difficult. Evidence of flight is a circumstance tending to show guilt, and the juror must have so regarded it, even though he might have been induced, without reflection, to have stated that it would not influence or prejudice his mind. There was no abuse of the large discretion lodged in trial courts in the matter of securing fair and impartial jurors. *State v. Arnold,* 12 Iowa 479; *State v. Dooley,* 89 Iowa 584; *Simons v. Mason City & Ft. D. R. Co.,* 128 Iowa 139; *Brusseau v. Lower Brick Co.,* 133 Iowa 245.

2. JURY: *voir dire*: effect of evidence.

III. Lorine Ellis, sister of defendant's wife, after testifying to what happened at the house, and to finding a revolver under defendant's pillow on two different mornings when defendant was stopping there, while his wife was visiting, and that she had given him the revolver about a year previous, at Moberly, Missouri, when he was employed by the Wabash Railroad Company, was asked, on cross-examination, whether "he always carried a gun? A. I cannot

3. CRIMINAL LAW: other offenses.

say that he always carried it; I know of one time before that he carried a gun. There is no use to lie about it,—I know that." Defendant objected to the testimony, and moved that it be excluded, as incompetent, irrelevant, and immaterial. This objection was overruled. "Q. That was the time that he shot a man at a dance at Hannibal? A. Yes." Counsel for defendant objected to the question, and moved to exclude the answer, as incompetent, irrelevant, immaterial, and not proper examination.

This motion should have been sustained. The inquiry related to a distinct transaction, in no manner connected with that under investigation, nor with anything brought out on direct examination.

IV. The defendant testified in his own behalf. On cross-examination, for the purpose of testing his credibility as a witness, he was asked whether, in April, 1907, he had a fight at a shoe factory in Hannibal, Missouri, and got fined; whether, on May 7th, he and one Hammond got into a fight at the same place, and licked three fellows, one of whom had brass knuckles; whether on July 15, 1907, he slugged one Young, and was fined; whether, on November 25, 1907, he got into a fight in Cheny's Hall, at Hannibal, Missouri, and was searched, and found to be armed with a dirk and a revolver; whether, on August 29, 1908, he got into a fight at Alger's Hall, in that city; whether, on October 28, 1908, he fought the Banta boys and bruised the leg of one of them, and on the next day was followed by officers to Moberly, Missouri, thrown into jail, and taken back to Hannibal; and whether, 7 or 8 years ago, he assaulted Officer Little, at Hannibal, by hitting him over the head with a club, during a shoe factory strike; and whether, at one time, he made application to a detective agency for a position. Objection to each inquiry as incompetent, irrelevant, and immaterial, not cross-examination and too remote, was overruled. The answer to each

*4. WITNESSES: depraved habits, antecedents, etc.*

question was a denial, or that he did not remember, except that he was fined one dollar and costs. He was then shown what purported to be a diary kept by him during 1907 and 1908, and, after repeated inquiries, admitted that the entries, except one item, appeared to have been made by him; and then all the matters referred to above were gone over again, in connection with the diary, and answers made, either explanatory of those previously given, or that he did not remember. Then extracts from the diary were introduced, as that of February 11, 1907, that he was 19 years old today; April 1, 1907, that he got into a fight at the factory and was discharged; May 12, 1907, that he and Jack Hammond whipped three fellows, but Jack got his head split "with a pair of nucks;" July 13, 1907, was arrested for throwing and hitting Albert Young on the head, and fined one dollar and costs; November 25, 1907, got into a fight at a dance, when the cops searched him, but did not arrest him, and did not discover a dirk or revolver he had on his person; February 1, 1908, that he was 20 years old that day; August 29, 1908, that he attended a dance at Alger's Hall, and got into a fuss with a fellow; September 6, 1908, that he got drunk, and went to a dance, from which two fellows undertook to take him home, when they had a fuss, and he went on alone, reaching his room at 4:54 o'clock in the morning; October 21, 1908, attended a dance, and got into a fight with Banta, who hit him without provocation, and he (defendant) shot at him (Banta), whereupon 7 fellows followed him home, and threatened to kill him; November 6th and 7th, 1908, was arrested at Moberly, Missouri, and taken back to Hannibal, Missouri, where he was tried and acquitted, at a cost of $40. Possibly some of these have been omitted. All the above were received, over objections like that recited, and all related to transactions occurring at Hannibal or Moberly, Missouri, when the accused was 19 or 20 years of age, according to the diary, or 17 or 18 years of age, as he

testified,—and was corroborated by Little,—and, as observed, 8 or 9 years previous to the offense charged in the indictment.

As the defendant had tendered himself as a witness, he was subject to all the tests of credibility applicable to other witnesses. *State v. Teeter*, 69 Iowa 717; *State v. Hayden*, 131 Iowa 1; *State v. Wasson*, 126 Iowa 320; *State v. Kuhn*, 117 Iowa 216; *State v. Pugsley*, 75 Iowa 742. That specific acts, tending to discredit a witness, even though the accused, may be inquired into on cross-examination, is well settled. *State v. Brooks*, 181 Iowa 874, and cases therein cited. As remarked in *People v. Webster*, 139 N. Y. 73:

"It is now an elementary rule that a witness may be specifically interrogated upon cross-examination in regard to any vicious or criminal act of his life, and may be compelled to answer, unless he claims his privilege. A party who offers himself as a witness in a criminal case is not exempt from the operation of the rule. He is not compelled to testify; and if not examined, the law provides that it shall not give rise to any presumption against him. When he elects to become a witness, it is for all the purposes for which a witness may be lawfully examined in the case, and he is not, in the constitutional sense, 'compelled to be a witness against himself;' although, when subjected to the test of a legitimate cross-examination, he may be required to make disclosures which tend to discredit or to incriminate him. (*People v. Tice*, 131 N. Y. 657.) The extent to which disparaging questions, not relevant to the issue, may be put upon cross-examination, is discretionary with the trial court, and its rulings are not subject to review here, unless it appears that the discretion was abused."

Appellant does not question this rule, nor that, if the several inquiries related to recent events, the rulings would be correct—a point on which no opinion is expressed. The

contention is that these matters were too remote to be accorded any bearing on the credibility of the accused. ·

Nothing was shown, tending to his discredit, from 1908 up to the time of the tragedy under investigation. Even the evidence adduced by the State, tending to show that he was reputed a quarrelsome person, related to his residence at Hannibal, Missouri, over 8 years previous; and neither this nor any particular acts were shown by the proof to have continued, or to have been continuous or in any manner connected, through this span of years. The character or repute of a witness must, of course, relate to the time when he testifies. And inquiry must be confined to such recent period as that the evidence elicited will be likely to throw some light on his present character. *McGuire v. Kenefick,* 111 Iowa 147; *People v. Mix,* 149 Mich. 260; (12 Am. & Eng. Ann. Cases 393, and note). Impeaching evidence, other than that elicited on cross-examination, is restricted "to the neighborhood of the present residence of a witness sought to be impeached, and to proof of reputation at a time near that of the trial. When a residence has been so recently acquired that the neighbors of the witness are not likely to have ascertained his true character, and he, in all probability, has not thrown off that established in the neighborhood of his former abode, evidence of his reputation at the latter place may be received, as it may also when he has subsequently remained in no place long enough to become well known to his neighbors." *McGuire v. Kenefick,* supra.

It would seem that cross-examination bearing on credibility should have limitations somewhat analogous with those put upon inquiries concerning reputation and moral character of other witnesses; though courts apparently have been much more liberal in the period covered by cross-examinations,—and so for the very evident reason that the matter of best evidence is not involved in the latter, and the search

in cross-examination is into the inner life of the witness, as manifested by what he has done.

Character, the inner man, can be known to the world through what he has done and said, as manifested by the outer man; and the world's estimate of him is reputation, and reputation is taken as proof of character. It is not always correct; for a person of bad character sometimes is of good repute, and vice versa. It is, however, the best evidence available. Cross-examination tends to uncover for the jury or court the life the witness has led, and to allow the jury to say for themselves what influence the life lived would have on the credibility of the witness. Even to cross-examination there should be some limit, beyond which the veil should not be raised. *State v. Reed,* 53 Kan. 767 (42 Am. St. 322) ; *Eads v. State,* 17 Wyo. 490 (101 Pac. 946) ; 40 Cyc. 2597, and cases collected. See interesting discussion in 2 Wigmore on Evidence, Sections 981 *et seq.* Where the line shall be drawn, is quite generally left to the discretion of the trial court, and only on abuse thereof will its exercise be interfered with. So much depends on the peculiar circumstances of each case that no unvarying rule can be laid down; but it may be said that the cross-examination can be extended back as far as inquiry of general reputation for truth and veracity, or proof of general moral character; and there seems no tenable reason for permitting cross-examination relating to specific acts to extend farther into the past, unless these are in some way related to the facts or acts under consideration, and are in some manner given significance thereby. This is a rule well calculated to allow sufficient leeway to inquiry, and, at the same time, put a stop to opening up the past, short of turning cross-examination into oppression and an attempt to harass or disgrace the witness, rather than to test his credibility.

The accused had come to Keokuk on March 16th previous to the shooting, prior to which he had resided at Mober-

ly, Missouri, since November 8, 1913. He seems to have been in Keokuk from February 2, 1913, until May 8th, and to have gone from there to Moberly, Missouri, and on to Marshall, where he remained until shortly before returning to Moberly, as before stated. What he did, save that he was married, July 21, 1912, or where he lived during the years from 1908 to 1913, does not appear; but he certainly, in living at Moberly from November 8, 1913, until September 23, 1916, nearly three years, remained there long enough to establish a reputation as to character and veracity; and there was no occasion for skipping back another five years for proof, in the evidence of others and in his cross-examination, as to his general moral character, as bearing on his credibility as a witness at the trial. Especially so, inasmuch as, in so doing, the inquiry related to the indiscretions and vanities of youth and inexperience. Even though all he recorded were true, the subsequent years, without apparent fault on his part, would seem quite sufficient to wipe away the stain of youthful follies. The prejudicial character of the evidence is manifest. We are of opinion that the court abused its discretion in receiving this evidence.

The suggestion was made on oral argument that the evidence was elicited on cross-examination on defendant's remark that he was "not a man that looks for trouble;" but that was brought out in cross-examination, and surely might not be regarded as a basis for cross-examination otherwise improper. No inquiry was made of him as to his character as a peaceable person.

Exceptions to the instructions are hypercritical, and require no attention. For the errors pointed out, the judgment is reversed, and the cause remanded.—*Reversed and remanded.*

PRESTON, C. J., EVANS and SALINGER, JJ., concur.