STATE OF IOWA, Appellee, v. EARLE PRENTICE, Appellant.

**LARCENY:** Recent Possession—Explanation of Possession as Jury
1  Question. Evidence held to present a jury question on the issue whether the defendant's recent possession of property was felonious.

**LARCENY:** Elements of Offense—Nonconsent Shown by Circumstances.
2  The element of nonconsent of the owner to the taking of his property may be shown by the circumstances attending and following the taking.

**WITNESSES:** Impeachment—Use of Opiates. Denial by a witness
3  that he is a user of opiates may be met by testimony tending to show the contrary, and the effect on the mind and memory.

*Appeal from Lucas District Court.*—C. W. VERMILION, Judge.

JUNE 21, 1921.

REHEARING DENIED OCTOBER 1, 1921.

DEFENDANT was accused and convicted of the crime of larceny for the theft of an automobile. He appeals.—*Affirmed.*

*O. A. Stafford, M. L. Temple,* and *W. W. Bulman,* for appellant.

*Ben J. Gibson,* Attorney General, *B. J. Flick,* Assistant Attorney General, and *C. F. Wennerstrum,* County Attorney, for appellee.

PRESTON, J.—The trial in the district court was at the October, 1919, term. The errors relied upon for a reversal are

that the evidence is not sufficient to sustain the verdict of the

1. LARCENY: recent possession: explanation of possession as jury question.

jury,—and particularly it is claimed that the *corpus delicti* has not been established, in that nonconsent of the owner is not shown; ruling out evidence offered by defendant; and admitting evidence as to the use of drugs by one of defendant's witnesses.

1. If the evidence of the defendant is true, and a verity, and the evidence offered by the State in contradiction is ignored, then the verdict should have been for the defendant. The case is argued as though this were the situation, and as though this court were the jury, and the triers of fact questions. The defendant is corroborated at different points by his wife, mother, stepfather (whose name is Dr. Brittell), and others. They are contradicted by evidence for the State, and by the circumstances.

The car taken was a Buick, Model D-55, and was the property of Tom Hooper, of Chariton, Iowa. It was taken from the streets of Chariton in the evening of September 8, 1919, and, according to the testimony of the State, it must have been taken between the hours of about 8:50 and 10 or 10:30 o'clock. If it was taken by the defendant, then, according to his and other testimony, it must have been taken between about 9:15 and 9:30 o'clock. The defendant and his wife and mother were at the theater. He says he got there about 8:15 or 8:30 o'clock, and left the theatre about 9:15, because his wife was sick, and needed air. Another witness says that he saw defendant come in about 9 o'clock, and that he sat there about 15 minutes, and he and his wife went out. The identity of the car taken, and that it was the one in the possession of the defendant a few minutes after the taking, is abundantly established. It is identified by the Miley garage people and others, where defendant had it to secure gasoline, shortly after the taking. Defendant, as a witness, admits that he was at this garage at about the time stated, and purchased gasoline for the car, and that he was driving it. He says, however, that, if it was Hooper's car, he did not know it. As said, the identity of the car in possession of defendant is shown. We shall not go into the details of the evidence on the question of identification. Defendant's explanation of such possession is not entirely reasonable and convincing. It was

such as to make it a question for the jury whether he had properly explained his possession. The evidence in regard to his explanation will be referred to later.

On the evening in question, Mr. Hooper, the owner of the car, had driven it and parked it near the Lincoln Theater. He entered the theater about 8:50 P. M. After attending the performance, he returned to the place where he had parked the car, at about 10:15 P. M. He says:

"I discovered the car was gone. I never have seen the car since. I endeavored to locate the car; have never gained any information as to where the car is. I made one trip to Des Moines and two to Centerville. I got a tip that the car might be there, some three weeks or a month after. Went to Centerville at the suggestion of defendant's attorney. Went around to each of the garages there. Its fair market value was $1,250."

He describes the car, and the kind and condition of the tires; and says that the car was newly painted, clean, and in good shape, and so on. A car with similar tires was traced about six miles southwest from Chariton, but the witness testifying to this says that he could not say that it was the Hooper car. There is evidence that there were two or three other cars of this same make and model in Chariton and vicinity. The defendant lived in Des Moines, where he had been night clerk for a short time at the Lloyd Hotel. He formerly lived at Chariton, where his mother lives. He had been subpœnaed as a witness, to appear at 9 o'clock A. M. of the 8th; but the case had been dismissed. He intended to return to Des Moines on the afternoon train, but missed the train. He and his wife drove to Des Moines that night in a car, which the State claims was the Hooper car. Defendant says he was with two men. There is evidence that, a few days previously, defendant had attempted to get a man by the name of Hoover, living in Des Moines, to assist him in stealing an automobile, saying that a Buick car would be the easiest. Hoover is corroborated to some extent in this by his wife. Defendant testifies that, when he and the other three returned from Chariton to Des Moines, and when defendant and his wife left the car at Sixth and Walnut, at about 1:30 o'clock in the morning, he saw Hoover there. This is denied by Hoover, who testifies that he saw defendant the morning of the 9th, and that de-

fcndant said to him that, if anyone asked if he (Hoover) had seen defendant, he should tell them "Yes, about 1:30 the night before." Defendant claims that the two strange men who let him and his wife out in Des Moines turned north, in a direction that would take them out of Des Moines to the north. Defendant says that, after he and his wife got out of the car, they had to wait until 2 o'clock for an owl car, and that they looked in the shop windows until time for the car; that they lived about 12 or 16 blocks from the point where they got out. Defendant is 22 years of age. He was married in September, 1918, divorced, and married again in July, 1919. After testifying to some of the matters before referred to, he testifies in regard to his different residences and occupations; says that he was bell boy in Chicago and in another place in Illinois; testifies to his coming from Kansas, his being in San Francisco and in the Philippines; says that he was called in the war service, but did not enter, that he was in the draft list in Chicago,—had resided there, was there about a week and a half or three weeks; and so on. Later, he says, he was in the service; went in as a cavalryman, but was transferred to the hospital corps, on account of his health; was in there two years. He says he met the two men with whom he claims to have ridden from Chariton to Des Moines at the state fair in Des Moines; that they gave their names as Edwards and Connor; that he doesn't know Connor's first name; that he heard them mention St. Paul, but that they didn't say they lived there; that he saw them in the pool hall, playing pool for money, at the back table—play greenhorns for money. Defendant says he played with them twice. He says he never met them outside the pool hall; that, when he met them, he was with them for a short time; that perhaps they were around Des Moines just a few weeks during the state fair of 1919; that he met these two men in Chariton about 7 o'clock in the evening of September 8th; that they said they had been to a soldiers' reunion, but did not say where; that they asked defendant what he was doing in Chariton, and when he was going back; that they asked him if he would care to drive back with them, and said that his wife could go with them; that defendant arranged to meet them about 9:30 o'clock; that they inquired about a family of Taylors, saying that they knew him, and he

had been to the state fair; that defendant told them he knew some Taylors, but they were not the ones; that defendant and his wife arranged to go with them. They say it was talked over in the presence of defendant's mother, at her home. He says that, after leaving the theater, about 9:15, he and his wife were walking around to get the air, and that another reason was that they thought they might possibly meet those two men that early. The second time around the square, they met the men, who asked if they were ready. He introduced his wife to them, and she said she was ready to go. He testifies that they got in the car; that it was probably a quarter to 10; that he and his wife got in the back seat, the other two in the front seat; that it was a Buick car; that there was the usual number of people on the street, but that he doesn't recollect seeing anyone he knew; that the two men got mixed up in directions, and with the railroad track, and defendant explained to them that the track there was on an abandoned spur; that they talked of needing gas, saying that they had forgotten to get it. The evidence of Hooper is that there were but two or three gallons of gasoline in the car when he left it. Defendant directed the men to a garage, he says; but they were not selling gasoline there, and he directed them to another. The men then said they wanted to send a message, and get something to eat, and they asked defendant if he could get the gas while they were doing that. He showed them where the depot was, and they drove there, and the two men got out. Defendant and his wife then got in the front seat. They didn't know anybody around. There is a lunch counter at the depot, and both the telephone and telegraph station. The men told defendant to get 10 gallons of gasoline, and handed his wife a $10 bill. The two men got out at the depot, and defendant drove the car to Miley's and got the gasoline, paying $3.00 therefor. He was at the garage about 15 minutes. He saw nothing suspicious about the actions of the men. In going to Miley's he thought it sounded as if a tire was down, and he inspected it, and found it all right. He was well acquainted with the garage people, and he is well known in Chariton. He noticed that one of the tires had a torn place in it,—not worn. It was standing up all right; very little of the rubber torn. It was back in place. Hooper had testified that there was a torn place

in one of the tires on his car.   There were men around there, but he paid no attention to who they were, except the man who waited on him, whom he knew, and who knew defendant.   He went around the block, to go back to the depot, because he didn't want to turn in the street.   He went to the depot, and the men were waiting.   They got in the front seat, and defendant and his wife in the back.   They then drove around the end of the levee, and onto the road,—the road that leads to Des Moines.   They took the middle road; went through towns; got off the road once; went a short distance, and they backed up.   They had a spotlight, and went up the road and flashed it on the posts with the trail sign, the Capitol Trail.   He has not seen the two men since; tried to locate them; tried to help Hooper recover his car.

"It must have been nearly 10 o'clock when we were at the depot.   Don't know whether they sent a telegram or not.   They said they were going to get a lunch, and send a wire.   I suppose we were in the city about 20 minutes, after getting in the auto."

When he went to the depot for them, he says there was no delay to speak of,—perhaps two or three minutes.   He denies that he went to Hoover's house, the morning of September 9th; denies the conversation as testified to by Hoover, the morning of the 9th; and also denies the prior conversation, in regard to stealing the car.

This is the substance of defendant's story, although the different circumstances were gone into with much detail.   Defendant's wife gave similar testimony as to the trip.   His mother testified as to the conversation earlier in the evening; that they were going to Des Moines in a car, and so on.   The manager of the telephone company at Chariton shows that there was a telephone call at 9:50, calling Russell.   The call was from the pay station at the Burlington depot, for No. 100, at Russell.   As near as he could make out from the ticket, the 100 resembles 110 in appearance.   There is no showing as to who the party was, making this call.   Though it is about the time defendant says he let the two men out at the depot, the call was made by some-one, whoever it was, a few minutes before the time defendant estimates that they got to the depot.   The telephone operator at Russell says they do not have a phone No. 100 in Russell.   They do have a No. 110, which is Mrs. Taylor.   Another witness at

Russell says that there was a Mrs. Taylor, a widow, living on a farm, who had a grown son who has been in Canada. She and her son were then in the state of Washington; went about September 20th.

Another lady living at Osceola testifies that she was in Chariton September 8th; that she visited and stayed with defendant's mother before the trial; that she intended to leave Chariton for home at 6 P. M.; that she missed that train; that she stayed to go on No. 5.

"I learned at about 9:30 P. M. the time that No. 5 would go. I left on No. 5, something like 3 in the morning. I called at the depot that night. The purpose of my visit to the depot about 9:30 was to find out what time No. 5 left. I went to the depot to find out about the time of No. 5. That was about 9:30, I believe. I wanted to know before I went to bed, so they would know what time to call me, exactly. I stayed at Mrs. Pugh's until the morning train. While I was there, saw a car drive up. They were two men and Earle Prentice and his wife. Did not know the other men. Did not speak to them, but recognized who he was. I was after medicine for my brother, who had been sick for a good many years; in bed about six months. Dr. Brittell was his doctor. Had medicine all the time. When I saw defendant at the depot, he was getting out of the car. Couldn't say what kind of a car it was, whether a Ford or a Pierce Arrow. Don't think it was a Ford. Couldn't describe the two other men."

This is the substance of her testimony, though she went into considerable detail, both in direct and cross-examination. It will be observed that witness fixes the time she was at the depot at about 9:30, and the jury may have concluded that it was before 9:30, since she was there for the purpose of inquiring about the time of the 9:30 train. If this be true, it was before defendant went to the depot, according to his testimony, and about the time, or perhaps before, the car was taken. The witness was somewhat evasive in her answers, when interrogated in regard to her use of morphine or opiates; denied that she used the drug, or that she had purchased any of doctors. No reason is given why she did not get medicine for her brother at Osceola, as well as Chariton. There is other evidence tending to show

that she was addicted to the habit. This evidence will be referred to more in detail when we come to consider the error assigned on the admission of such evidence. The testimony shows the effects of the use of morphine as to vision, and so on. The State claims that this is important, since she claims to have seen the defendant; and that her testimony is weakened or destroyed by the evidence on this subject. At any rate, the weight of her testimony was for the jury.

Two other witnesses testify that they were at the depot at about 10:20 or 10:25 P. M., for the 11 o'clock train, and that they did not see defendant and the others at the depot, or see such a transaction as testified to by defendant and the witness last referred to. The jury may have concluded that these two witnesses were there at a time when, according to defendant's testimony, he would have been more likely to be at the depot, if he was there. The story about the two strange men may be a myth, or they may have been confederates. We are not called upon to pass upon this question, since it was the province of the jury to pass upon the question of defendant's explanation of his possession of the recently stolen car. Some of the circumstances are unusual and out of the ordinary; but we shall not take the time or space now to repeat the circumstances that indicate to us that such is the fact. From the evidence before set out, we are of opinion that the evidence was such as to make a jury question on that point, and as to the guilt or innocence of defendant. The jury had all the evidence, of which the foregoing is a condensed statement. The State cites, on the question as to the sufficiency of the evidence, *State v. Rebbeke,* 189 Iowa 514; *State v. Kimes,* 145 Iowa 346, 348; *State v. Hayward,* 153 Iowa 265, 267.

2. It is contended by appellant that it was not shown in the evidence that the owner of the car did not consent to its being taken. It is contended by appellant that this is necessary, and we understand the State to so concede; but they claim that the fact may be proven by the circumstances. The owner was on the stand, and could readily have testified to that, had he been asked. There is no pretense anywhere in the record that defendant or anyone else had the consent of the owner to take

2. LARCENY: elements of offense: nonconsent shown by circumstances.

it. In fact, defendant makes some claim that the car was not identified, and claims that he did not take the car at all, either with or without the consent of the owner. The place from which it was taken, and the time of night; the fact that it was taken ·secretly, while the owner was in the theater; the owner's conduct afterwards, in immediately commencing a search for the car; the fact that the car was never heard of; and the other circumstances in the record, are sufficient to sustain a finding that it was not with the consent of the owner. The authorities hold that this may be proven by circumstantial evidence.

3. We have heretofore briefly referred to the matter of the use of morphine by the lady who claims to have seen defendant at the depot. We do not understand appellant to claim that this

3. WITNESSES: im-
peachment:
use of opiates.

was not proper cross-examination of the witness, as bearing upon her credibility; but his contention is that it was a collateral matter, and that the State is bound by her answers, and may not impeach her thereon. To this general rule, they cite *Livingston v. Heck*, 122 Iowa 74; *State v. Roscum*, 119 Iowa 330; 40 Cyc. 2562, 2569, 2570. See, also, 28 Ruling Case Law 618, Section 207. Appellant also cites *Botkin v. Cassady*, 106 Iowa 334, 336, where it was held that, under the circumstances of that case, evidence of the use of morphine or opiates was improperly admitted; but in that case, there was no evidence as to the effect of such use on the mind, memory, etc. Such is not the situation in the instant case. The State contends that, under the record in this case, it was not a matter of collateral evidence or impeachment, but that the evidence was properly admitted, as independent evidence. Without going into the evidence too much in detail, Dr. Dougherty testified, over objection, that the lady referred to applied to him in his capacity as druggist, and in connection with his drug business, for morphine; and that the last time she so applied was February 21, 1919. He also testified to the effects, symptoms, and characteristics noticeable in the user of morphine or an opiate. The color of the face is characteristic. As to the poison of morphine, nervousness is another prominent factor; the nervousness and the change, the general change in a person's characteristics. He says that the eyes are not especially affected, except during a period of excitement following an ad-

ministration of the drug. Mrs. Atha, cousin of the witness referred to, who had known her for 15 or 16 years, when asked if she had seen the person use a white tablet, answered that she had, but couldn't swear what it was; but testified that she had seen her dissolve those little white tablets and use them with a hypodermic needle and inject it in her skin.

"Have seen her use that at different times in that way. I refuse to answer the purpose for which she was taking that medicine, and who administered it. I know she had a couple of operations."

The evidence does not show that the witness was under the influence of an opiate, either at the time she testified or at the precise time when she claims to have seen defendant at the depot. But the evidence does tend to show that, at about that time, or before, she was in the habit of using it. The evidence is, perhaps, not as strong as in *People v. Webster,* 139 N. Y. 73 (34 N. E. 730, 734) ; but in that case, under the evidence therein, it was held that such evidence was competent, as independent evidence.

Appellee also cites, in support of the ruling, 40 Cyc. 2575; *State v. Fong Loon,* 29 Ida. 248 (158 Pac. 233); *State v. Dillman,* 183 Iowa 1147; *Potter v. Brown,* 90 N. W. 912. We find no such case as the last one cited, and the *Dillman* case does not quite reach the point. The cases are not in harmony on the question. It has been held that it may be shown that, at the time the facts sworn to occurred, the witness was intoxicated; and that this may be done, not only by the evidence of another witness, but by cross-examination of the witness himself; and that it is unnecessary to lay a foundation for the introduction of proof of this character by first questioning the witness. *Bliss v. Beck,* 80 Neb. 290 (114 N. W. 162, 16 Ann. Cas. 368, 369 [Note]); *State v. Schuman,* Ann. Cas. 1918 A, 642. In some courts, the broad rule prevails that the habitual use by a witness of a drug or narcotic which tends to impair the mind, affect the memory, or lower character, may be shown for the purpose of affecting credibility. *State v. Fong Loon,* 29 Ida. 248 (L. R. A. 1916 F, 1198, Ann. Cas. 1918 A, 640). In 28 Ruling Case Law 617, Section 206, it is said that any evidence going to show that the mind and memory of the witness are impaired by disease or otherwise,

and are in a feeble condition, is competent to discredit his testimony. *Alleman v. Stepp,* 52 Iowa 626 (35 Am. Rep. 288, and note), and *Derwin v. Parsons,* 52 Mich. 425, are cited in support of the text. In our case of *Alleman v. Stepp,* supra, the case was reversed because evidence was excluded tending to show that the mind of defendant, who had testified as a witness, was impaired. A number of cases are cited in the *Alleman* case. Other courts take the view that, in order to discredit or weaken the testimony of a witness, it is not enough to show that the witness is in the habit of using opiates, but that the proof must go further, and show that the mind is impaired generally by its use, or that he was under the influence of the opiate at the time the transaction occurred, or the testimony taken. *State v. Gleim,* 17 Mont. 17 (31 L. R. A. 294) ; *State v. Schuman,* 89 Wash. 9. It has been held that the insanity of a witness may be shown. *State v. Pryor,* 74 Wash. 121 (46 L. R. A. [N. S.] 1028). It is not permissible, however, to compare the mind of the witness with the minds of others. *People v. Enright,* 256 Ill. 221; *Alleman v. Stepp,* supra; *Dundas v. City of Lansing,* 75 Mich. 499 (5 L. R. A. 143). We are of opinion that this evidence was admissible, and proper to be considered by the jury for what it was worth.

4. The defendant, called in rebuttal, testified that he had a conversation with Hoover after September 8th. He was then asked:

"Q. In that conversation with Hoover, who mentioned Centerville?

"Q. State whether or not, in that conversation,—whether that conversation was before or after Hooper's car was said to have been taken?

"Q. Under whose direction did you go to the house?

"Q. What, if anything, did Hooper have to do with your going to that house?"

These questions were objected to by the State as immaterial, and not surrebuttal. The objections were sustained. The purpose of this evidence is not apparent. No offer was made as to what the purpose was. We take it that it had reference to the efforts of defendant to assist Hooper in locating the car. The defendant had testified in regard to that in chief, and that, since he was accused, he had paid closer attention to Hoover,

and to learn who his friends were; that he sent his wife to Centerville, as a result of his investigations of Hoover, to see if they were possibly the people who drove the car; that he was at Hoover's residence three or four days after the night he returned from Chariton, and had a conversation with him. It seems to us that the evidence was not surrebuttal, and that, in any event, its exclusion was not prejudicial.

We discover no prejudicial error in the record, and the judgment is, therefore,—*Affirmed*.

EVANS, C. J., WEAVER and DE GRAFF, JJ., concur.