## KELLY v. MARYLAND CASUALTY CO.

District Court, W. D. Virginia.

July 16, 1929.

Opinion No. 2.

McDOWELL, District Judge.

A trial of this case recently held resulted in a hung jury, and it is expected that the case will be retried. The most important witness for the plaintiff, a woman, testified concerning an alleged robbery of a bank. Counsel for the defendant, desiring to thus impair the credit of the witness, avowed ability to prove by a physician then present that the woman had for about 18 months been addicted to the use of morphine. It sub-

sequently developed that she used from three to five grains per week. The physician, a rather youthful general practitioner, would also have testified: "My opinion is that an excessive use of morphine, such as indicated, might tend to undermine the morale of a person, especially for truthfulness, and make them cunning. It also tends to make them unreliable. I might also say that a drug addict might feign anything."

I held the avowal insufficient to justify evidence of the woman's drug addiction, and the propriety of that ruling justifies a somewhat elaborate discussion of the admissibility of evidence of narcotism, and more especially of evidence of morphinism, in order to weaken the credit of an opponent's witness.

### The Rules in the Law Books.

**1. *Effect of Drug Addiction Matter of Common Knowledge.***

In State v. Concannon, 25 Wash. 327, 65 P. 534, 537, it is said:

"The habitual use of opium, as shown, by Dunlap, is known to utterly deprave the victim of its use, and render him unworthy of belief."

**2. *Narcotism Usually Causes Moral Depravity.***

In the following cases there seems to be at least implied adherence to a theory that the habitual use of a narcotic drug causes moral depravity: State v. Prentice, 192 Iowa, 207, 183 N. W. 411, 412, 413, 15 A. L. R. 904, 911; Anderson v. State, 65 Tex. Cr. R. 365, 144 S. W. 281, 282; Beland v. State, 86 Tex. Cr. R. 285, 217 S. W. 147.

**3. *The Dream State Theory.***

In State v. Fong Loon, 29 Idaho, 248, 158 P. 233, 236, L. R. A. 1916F, 1198, it is said:

"We believe it will be admitted that habitual users of opium, or other like narcotics, become notorious liars. The habit of lying comes doubtless from the fact that the users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities."

The foregoing was suggested by a somewhat similar statement in Wharton & Stillé, Medical Jurisprudence (3d Ed.) § 1111, quoted in the opinion.

**4. *Professor Wigmore's Rule.***

In 2 Wigmore, Ev. (2d Ed.) § 934, it is said:

"Any diseased impairment of the testimonial powers, arising from whatever source, ought also to be considered. * * * Ac-

cordingly, [evidence of] the morphine or other drug habit, in that it may have had such an effect, should be received."

In a note to the foregoing text (page 322), the author says of one of the opinions cited that it "shows no appreciation of modern science."

**5. *Drug Addiction a Collateral Matter.***

In State v. King (1903) 88 Minn. 175, 92 N. W. 965, 968, the trial court refused to permit the defendant to prove that a witness for the prosecution was a confirmed opium eater; and that the use of opium renders the user unreliable in his statements and prone to falsehood. This ruling was approved, on the ground that the matter was a collateral issue.

**6. *The Rule in Cyc.***

In 40 Cyc. 2575, it is said:

"The mere fact that a witness uses or has used drugs does not impair his credibility in the absence of any showing that his mind or memory has been affected thereby, or that he was under the influence of drugs at the time of the occurrence as to which he testifies, or is under such influence when his testimony is given."

See, also, 15 A. L. R., note page 912; 5 Jones Ev. § 2116 and 6 Jones Ev. § 2444.

Cases at least partly supporting the text quoted above are: McDowell v. Preston, 26 Ga. 528; Eldridge v. State (1891) 27 Fla. 162, 9 So. 448, 453; Franklin v. Franklin (1891) 90 Tenn. 44, 16 S. W. 557, 558; Williams v. U. S. (1904) 6 Ind. T. 1, 88 S. W. 334, 337, 338; Standard Oil Co. v. Carter (1923) 210 Ala. 572, 98 So. 575, 577; State v. Gleim (1895) 17 Mont. 17, 41 P. 998, 31 L. R. A. 294, 52 Am. St. Rep. 655, 663, 664; State v. Robinson (1895) 12 Wash. 491, 41 P. 884, 886; Wilson v. U. S., 232 U. S. 563, 567, 568, 34 S. Ct. 347, 58 L. Ed. 728.

In Katleman v. State (1919) 104 Neb. 62, 175 N. W. 671, 672, it is held that medical evidence as to the effect of drug addiction on the veracity-character of a witness shown to be a drug addict is inadmissible.

See also, of minor importance, Botkin v. Cassady (1898) 106 Iowa, 334, 76 N. W. 722, 723; State v. Schuman (1915) 89 Wash. 9, 153 P. 1084, Ann. Cas. 1918A, 633; People v. Webster (1893) 139 N. Y. 73, 34 N. E. 730, 734.

### Comments on the Rules of Law.

Preparatory to a consideration of the foregoing rules of law, I have examined every

medical work that I have been able to obtain from local physicians. In 3 Wigmore, Ev. (2d Ed.) § 1700 d, p. 651, it is said: "Finally (and apart from the use, already referred to, of literary works and dictionaries) there is often found an open and deliberate citation by the court itself to encyclopedias, medical works, and the like, as giving a foundation of fact for subjects involved in their decisions." In addition to the foregoing, the use I have made of medical works seem to me to be in this particular case fully justified. Several (variant) rules of law concerning the admissibility of evidence of drug addiction have been stated. I recur to these rules here merely to call attention to the fact that no court could have formulated, and no court could intelligently adopt or reject, any one of those rules, without having accepted as sound some theory as to the usual effect of narcotic drug addiction on the addict. And an intelligent adoption of one, rather than of some other, scientific theory makes necessary some knowledge of the different theories and of the reasoning supporting them. It seems to me to follow that it is the duty of a judge in my situation to inform himself as well as he reasonably may concerning the reasons for the differing medical opinions before he undertakes to make choice between them.

Again, it is to my mind much more satisfactory for the judge to read all the medical works he can reasonably obtain, rather than to rely wholly on the medical works selected by medical witnesses, whose selections might easily be influenced by conscious or unconscious partisanship.

### (A) *The Common Knowledge Theory.*

There is no doubt in my mind of the existence of a widespread popular distrust of the veracity of all narcotic drug addicts, even in respect to matters in general. But a widespread popular belief is not necessarily based in truth. If it relates to a matter of science, the popular belief may easily be a mere reflection of an opinion once generally held by scientists, but now repudiated by those who are best informed. An induction of medical science, and especially a very sweeping induction, cannot possibly be a matter of such notoriety as to be treated as true without evidence, unless it has the support of all, or of practically all, well-informed medical authorities. My examination of medical works has been quite incomplete; but I believe it has been sufficiently extensive for present purposes. Typical of what evidently was until recent times the universal,

or almost universal, medical opinion, and of what is still the opinion of a very considerable body of medical writers, are the following:

In Principles and Practice of Medicine (9th Ed.) by Sir William Osler and Dr. Thomas McRae, at page 392, it is said:

"Persons addicted to morphia are inveterate liars, and no reliance whatever can be placed upon their statements. In many instances this is not confined to matters relating to the vice."

In Lectures on Mental Diseases by Dr. Henry Putnam Stearns (1898) at page 446, it is said of morphinism:

"The moral sentiments become changed very early in the disorder of the general system. Regard and consideration for friends and relatives becomes less marked, the love for family is lessened, the judgment clouded, and the person untrustworthy and regardless of truth; in fact I have rarely known one addicted to the practice of opium eating who was not an incorrigible liar."

To much the same effect, see Bleurer's Textbook of Psychiatry, Brill's translation, at pages 354, 355; Diseases of Society and Degeneracy (1906), by Dr. G. Frank Lydston, at page 207; Tyson's Practice of Medicine (1906), at p. 1161; Hare's Practice of Medicine (1905), at page 854 and 855; Jack's edition of Wheeler's Handbook of Medicine (1920), at page 143; The Individual Delinquent by Dr. Wm. Healy (1915), at page 277; Sajous's Cyclopaedia of Practical Medicine (10th Ed. 1927), at page 192; XVIII Ency. Britannica (11th Ed. 1910–11), at page 863; 20 Americana, at page 712.

On the other hand, there is a more modern theory. In 2 Nelson's Loose-Leaf Living Medicine, at page 605 C, Dr. Alexander Lambert, of New York City, says:

"Many of those indulging in morphin seem normal in all respects except in dealing with their habit, but in this regard fear of physical suffering, if they are deprived of their usual dose, brings on the most intense defensive reactions; they will give all kinds of excuses and they will invent all kinds of pretexts to obtain what they want; they will not hesitate to lie and deceive if fear pushes them that far."

And at page 607 C:

"Like all takers of narcotics, the users of morphin are untrustworthy so far as any statements they make about their drug taking are concerned, unless they realize that they will obtain their drugs without ques

tion and unless they have confidence in the person with whom they are discussing the matter."

In Drug Addiction in its Relation to Crime, by Dr. Lawrence Kolb, United States Public Health Service (Mental Hygiene, vol. IX, No. 1 pp. 74–89), reprint page 2, it is said:

"No addict who receives an adequate supply of opium and has money enough to live is converted into a liar or thief by the direct effect of the drug itself."

In Pleasure and Deterioration from Narcotic Addiction, by the same writer (Mental Hygiene, vol. IX, No. 4, pp. 699, 724), reprint p. 14, it is said:

"That individuals may take morphine or some other opiate for twenty years or more without showing intellectual or moral deterioration is a common experience of every physician who has studied the subject."

And again at page 25:

"Much of the moral deterioration attributed to narcotics in the past was not deterioration, but an original nervous instability and moral obliquity."

In The Narcotic Drug Problem (1920), by the late Dr. Ernest Bishop, of New York City, it is said:

"What is true of one man who has opiate addiction may be absolutely false of another. One narcotic addict is honest, competent, truthful and intelligent. Another is dishonest, incompetent, untruthful and incapable of appreciation or self-control. Neither the one set of attributes, nor the other, is peculiar to narcotic addicts. They are simply personal attributes possessed by different men and types of men who may not be narcotic addicts."

In Narcotic Drug Diseases and Allied Ailments (1913), by Dr. George E. Petty, who (page 11) had at that time "observed the treatment of more than 3000 drug patients," it is said, at page 311:

"The mere use of opiates does not make perverts or moral degenerates of people who were of good character before the use of the drug was begun, and the fact that some such persons do retain their integrity and sustain their character and standing in the communities in which they live, notwithstanding the use of the drug, forces us to look elsewhere than to the effect of the drug for an explanation of the traits of character usually seen in drug users."

Again, page 320:

"As a result of attributing the perverse traits of character manifested by some morphine users to the effects of the drug, both the profession and the public have fallen into the error of looking upon all opium users as of the same class, and, since the comparatively small number of perverts among them are the ones who have become most commonly known, they have made the reputation by which all are judged.

"Such a conclusion is erroneous, and the opinion based upon it is manifestly unjust. Drug users differ from each other as greatly as do other people."

Again, page 321:

"Every drug user firmly believes that if he were deprived of his drug supply he would either die or go crazy, and he therefore feels justified in doing anything that may be necessary to protect himself from such an extremity.

"Most morphine users deny their habit, and on that account they are charged with being notorious liars and unreliable in all matters."

On the mere reading of the foregoing excerpts it is manifest that there is now no consensus of medical opinion to the effect that morphine addicts are usually abnormally untruthful in respect to matters not connected with the vice. And it follows that there is no justification for treating the older theory, or either theory, as a matter of common knowledge.

(B) *The Moral Degradation Theory.*

In the medical treatises I have read I find agreement, practically universal, on two points: Nearly all narcotic drug addicts are untruthful in respect to the fact of addiction. This is also true in respect to obtaining, and in respect to retaining possession of, the desired drug, where there is any fear of a failure of supply.

If narcotic drugs possess some mysterious and incomprehensible power to degrade the moral nature of their victims, narcotic addicts, if they have an interest to serve, should practice deceit in respect to matters in general as readily and as commonly as in respect to those facts about which it is almost universally agreed they do regularly deceive. And yet there is no agreement in respect to matters in general, while there is as to certain matters. In the language of the psychologists, the deception practiced by nearly all drug addicts in respect to the fact of addiction is a "defensive reaction" to the popular and almost universal aversion and contempt for drug addicts. That there is such

feeling towards drug addicts, and that it is almost universal, is indisputable. And a desire on the part of drug addicts to escape this odium furnishes an entirely sufficient reason why they practice deception in respect to the fact of addiction, and affords no reason why they should also practice deception in respect to matters in general.

Also in respect to obtaining and keeping a supply of the drug of addiction, there is a reason of great force which leads the addict to practice deceit which does not apply to matters in general. Practically every intelligent layman has heard of, and many have also read of, the frightful sufferings endured by drug addicts when deprived of a supply of the needed drug. As Dr. Petty puts it, supra, "Every drug user firmly believes that if he were deprived of his drug supply he would either die or go crazy. * * *" Certainly such fears supply a powerful motive for deception which does not exist in respect to matters in general.

And what has been said also disposes of the argument founded on what Professor Wigmore refers to that "worthless" maxim—Falsus in uno, falsus in omnibus. 2 Wigmore, Ev. (2d Ed.) § 1008. Drug addicts may almost universally lie in respect to two matters, but it does not follow that they will therefore lie in respect to other matters more frequently than will nonaddicts. "False in one, false in all," is simply a non sequitur; and as much so in respect to drug addicts as in respect to other people.

It may be added that it appears to be a fact that the medical writers hereinabove quoted who take the position that morphine does not cause moral depravity have specialized in the cure of drug addiction, and consequently have probably had much greater opportunity for observing the effects of drug addiction than have those writers whose work has covered a much greater range of subjects. And this fact affords a reason of much weight in support of the modern theory. .

Again, the assertion that drug addiction, in addition to its physical effects on brain and nerve tissue, has a psychic effect on the moral nature of the addict, seems to me to imply a greater knowledge of the connection between the nervous system and the moral nature than has yet been attained.

On the whole it seems to me that an inference that morphinism usually causes abnormal mendacity in respect to matters in general is of such doubtful validity that it cannot be accepted as a rule of law.

(C) *The Dream State Theory.*

The theory expressed in State v. Fong Loon, supra, 29 Idaho, 248, 158 P. 233, L. R. A. 1916F, 1198, and in Wharton & Stillé (3d Ed.) § 1111, that narcotic drug addicts live in an unreal world and thus become "unable to distinguish between images and facts," has at the least considerable plausibility. In this country a very large number, perhaps a majority, of people who have passed middle age have, under medical treatment for some painful injury or painful temporary disease, experienced the dreamy state induced by morphine when administered to one unaccustomed to it. Hence the plausibility of the "dream state" theory. But because a narcotic drug has some particular effect on people who are unaccustomed to such drug, it does not follow that the same drug has a similar effect on those who have become addicted to its use. This opinion will be of such length that I cannot here do more than say that the impression left on my mind by the medical works I have read is that morphine addicts obtain from their usual dose merely freedom from "withdrawal pains," and that pleasurable sensations, including the dream state, can be obtained only occasionally and by means of a sudden increase in the size of the dose.

At the least, there is certainly room for some doubt if narcotic drug addicts do live in an unreal world. And, even if they do, the assertion that long-continued day dreaming causes mendacity seems to me to require more supporting evidence than I have been able to find. Day dreamers are usually impractical people, but they are not generally understood to be more untruthful than are people who do not indulge in day dreaming.

(D) *Impairment of Memory.*

Evidence of morphinism on the part of a witness clearly may be admissible if supported either by competent evidence to the effect that the memory of the particular addict in question has in fact been impaired; or by competent medical opinion evidence to the effect that the addiction of the witness in question had been for a sufficient period, or that the amounts used had been great enough, to probably impair the memory of the addict. But, with the greatest deference, it seems to me that evidence of drug addiction standing alone should not be admitted on the ground that it may have impaired the addict's memory. The addiction may have had such effect, and it may not. There is medical authority for the assertion that long-con-

tinued addiction, or a very large consumption of a narcotic drug, does usually impair the memory. But all drug addicts have not been such for a long period, and some do not use, and have never used, large quantities of the drug. In a large number of the medical works I have read there is no mention of impairment of memory as a result of narcotism; but it is spoken of in some of the books. Dr. Lydston, at p. 208; Professor Bleuler, at pages 354, 355; Dr. Stearns, at page 446; and Dr. Lambert, certainly one of the greatest authorities on the subject, at page 607 B, furnish sufficient authority for the belief that impairment of memory is a usual result of narcotism, if long continued, or if the dosage has been large enough. Consequently mere evidence of addiction would in many cases be inadmissible. And on retrial of the instant case, the usual result of the use of from three to five grains of morphine per week for about two years may be a question for expert evidence.

At the former trial the addict in question was examined and cross-examined at great length and with unusual acumen. She impressed me as being possessed of as nearly perfect a memory as I have ever seen exhibited. In this case, if there were introduced opinion evidence to the effect that in theory the addict's memory ought to be impaired, an interesting question might arise. My present belief is that the evidence of my own senses would outweigh the opposing evidence.

### (E) *Drug Addiction Collateral.*

If, in a case such as the one at bar, a witness is asked on cross-examination if he or she is not a drug addict and the witness denies the imputation, the fact may be collateral; that is, not relevant independently of a possible contradiction of the witness. 2 Wigmore, Ev. (2d Ed.) § 1003. The bald fact of addiction would seem to be collateral, and in respect to mere addiction the denial should be binding on the cross-examiner's client. However, such denial should not prevent the admission of evidence showing addiction on the part of the witness, if coupled with evidence tending to show permanent impairment of mental faculties; or even temporary impairment, if at the time of the occurrence testified to by the addict, or at the time of testifying.

Nothing here said relates to the testimony of defendants in prosecutions under antinarcotic statutes.

### (F) *The Rule in Cyc.*

In so far as this rule (40 Cyc. 2575) authorizes evidence that a narcotic drug addict was under the influence of the drug of addiction at the time of the occurrence about which the addict has testified, or is so at the time of testifying, the rule is clearly based on the theory that narcotic drug addicts are (like people who are not accustomed to the use of the drug) stupefied by the drug and that their powers of observation, memory, and narration are temporarily impaired.

If free to adopt the views I have gleaned from the medical authorities, I could not treat this rule as being sound. It would be contrary to all experience if the usual dose of a morphine addict were to affect him exactly as that drug affects people who are not accustomed to it. Hence there is much room for doubt if the usual dose of a morphine addict stupefies him, or if it has any effect except to prevent withdrawal pains. The medical writers seem to be agreed that whenever a morphine addict is not under the influence of at least his usual dose he is in a state which ranges from extreme discomfort to intense pain. In other words, morphine addicts should be mentally at their best when under the influence of the customary dose and at their worst when in need of it.

However, in Wilson v. U. S., 232 U. S. 563, 567, 568, 34 S. Ct. 347, 349, 58 L. Ed. 728 (1913), a defendant in a criminal case charged under the White Slave Act (18 US CA §§ 397–404) on cross-examination admitted herself to be addicted to use of morphine and stated that she had last had a dose of that drug at 10 o'clock on that morning. The Supreme Court held the evidence admissible. This ruling was a decision and not a dictum. The opinion reads, in part:

"But as we read the record, the evidence was not offered or admitted for its bearing upon her character, but rather to show that she was so much addicted to the use of the drug that the question whether, at the moment of testifying, she was under its influence, or had recovered from the effects of its last administration, had a material bearing upon her reliability as a witness. It seems to us that in this aspect the evidence was admissible. People v. Webster, 139 N. Y. 73, 87; State v. White, 10 Wash. 611, 613."

The case of People v. Webster, is also reported in 34 N. E. 730, 734, and State v. White in 39 P. 160, 161, 41 P. 442. The language above quoted and that used in the two cases cited seem to me to show that the

788

theory on which the ruling was based is that morphine (in any quantity) stupefies morphine addicts and renders them less able to remember and to narrate clearly when under the influence of the drug than when not under its influence. Clearly the ruling is not based on the theory that morphine addiction renders the addict mendacious. It is rather clearly based on the idea that if a morphine addict is under the influence of morphine, if he has not recovered from the effects of the last administration of the drug when testifying, the mental faculties of the witnesses are so benumbed as to have a material bearing on his reliability. Because the ruling in the Wilson Case is binding on me, except in cases that can be properly discriminated, the exact nature of the ruling is of great interest. The defendant in that case may have taken the dose on the morning of the day of trial merely to be comfortable. If such was her purpose, she probably took her usual dose. But as she testified that day in her own defense, in a felony case, it is possible that her purpose in taking the drug was also to have her wits at their best. If so, it is rather probable that she took more than her usual dose. I mention these conflicting probabilities as they forbid any presumption as to the size of the dose taken on the morning of the trial by the witness. And the opinion throws no light on this matter.

There is implied in the ruling a belief that the jury, knowing the hour when the dose was taken and the time when the witness testified, was capable of determining whether the witness was when testifying under the influence of the drug or had recovered from its effects.

In the Wilson Case the cross-examiner (illegitimately) extracted from the witness an admission of her addiction to the use of morphine. He next obtained the admission that she had taken a dose of the drug that morning. The ruling by the Supreme Court does not seem to me to necessarily sanction the extraction of both of the two admissions which were extracted from the witness in that case. The ruling does make admissible on cross-examination a question whether or not the witness had had a dose of morphine on the day the witness testifies. But whether or not the ruling also makes admissible further questions from the cross-examiner designed to show that the witness is a morphine addict is not very clear. I think that such is not a necessary effect of the ruling. Due to the popular belief that drug addicts are unveracious, knowledge by the jury of the bald fact of addiction would do an illegitimate injury to the credit of the witness. I say illegitimate, because the expressed basis of the ruling in question is not a probability of mendacity, but a probability of some degree of temporary stupefaction of the witness' mental powers.