STATE v. NORMAN W. KING.[1]

January 9, 1903.

Nos. 13,306—(26).

## Indictment—Accessory after Fact.

An indictment charging the accused with being an accessory to a felony after the fact should allege facts constituting the felony with the same degree of certainty as though the person who committed it were alone indicted. The indictment under which defendant was convicted is *held* sufficiently definite and certain in this respect.

## Witness—Use of Opium.

Defendant offered to show on the trial that a witness called by the state was a confirmed user of opium, had been addicted to its use for years, and that such use renders the person unreliable in his statements and prone to falsehood. The evidence was excluded by the trial court, and the ruling is *held* not error. The witness was before the court and jury. His appearance, demeanor, and the manner in which he gave his testimony, whether straightforward and unequivocal, or in a manner indicating untruthfulness or an unbalanced mind, were sufficient from which his credibility could be determined.

## Cross-Examination.

The extent to which the cross-examination of a witness may go for the purpose of testing his credibility, or showing his bias, prejudice, or hostility, rests in the sound discretion of the trial court. The fact that such an examination is permitted to go beyond reasonable limits is not reversible error, where the witness thus examined gave no testimony pertinent to any material issue in the case.

## Rebuking Witness—Discretion of Court.

It is a discretionary right and duty of a trial court, in the interest of the orderly conduct of proceedings before it, to rebuke and reprimand overzealous and overwilling witnesses when they constantly attempt to inject evidence into the case not called for by questions put to them; and its action in that behalf, where no reflections are cast upon the credibility of the witness, does not constitute reversible error, unless a clear abuse of discretion be shown.

[1] Reported in 92 N. W. 965.

**Misconduct of Jury—Use of Liquor.**

Defendant moved for a new trial on the ground, among others, of misconduct of the jury. At the hearing of the motion he applied to the court for permission to examine the jurors orally in open court touching the alleged misconduct. The application was denied; and it is *held* that, conceding that the misconduct complained of (indulgence in intoxicating liquor during the trial) might be shown by affidavits of the jurors, it was not an abuse of discretion in the trial court to refuse to permit them to be examined orally on the subject. The matter was one resting almost wholly in its discretion.

**Verdict Sustained by Evidence.**

The record is examined and considered, and it is *held* (1) to present no reversible error; and (2) that the evidence sustains the verdict of the jury.

Appeal by defendant from an order of the district court for Hennepin county, Simpson, J., denying a motion for a new trial after a trial and conviction of the crime set forth in the opinion. Affirmed.

*Welch, Hayne & Hubachek,* for appellant.

*W. B. Douglas,* Attorney General, *F. H. Boardman,* County Attorney, and *C. S. Jelley,* Assistant County Attorney, for the State.

BROWN, J.

Defendant was indicted, tried, and convicted in the district court of Hennepin county as an accessory to a felony after the commission thereof, and he appealed from an order denying his motion for a new trial.

We shall take up and dispose of the assignments of error, or those we deem necessary to refer to specially, without a preliminary statement of the facts in the case, any further than is found in the indictment, the main portions of which are set out below. The facts in detail will more fully appear in connection with some of the propositions discussed and decided. The various assignments present the questions (1) whether the indictment charges a public offense; (2) whether any errors prejudicial to defendant were committed on the trial below; and (3) whether the evidence is sufficient to sustain the verdict of the jury. The questions will be disposed of in the order stated.

1. It is urged that the indictment does not state facts sufficient to constitute a public offense, in that it fails to charge with sufficient definiteness and certainty that the principal named therein, Harry Adams, had committed the crime of which defendant is charged with being accessory after the fact. It is, within all the authorities, necessary to aver and allege in an indictment charging a person with being an accessory to a felony after the fact that a felony was committed by the principal, the facts constituting which must be alleged and set forth with the same degree of certainty as though the principal were alone indicted. It is not sufficient to charge that the principal committed a felony, naming it, but the facts constituting the same must be particularly averred. The point made against the indictment in the case at bar is that it charges the commission of a crime by the alleged principal by way of inference and recital only, and not by direct and positive averments. The indictment, so far as here involved, is as follows:

"Said Norman W. King being then and there a police officer in said city of Minneapolis, and being then and there duly appointed, qualified, and acting as such police officer, and then and there executing the functions of a public office, to wit, of a police officer of said city of Minneapolis; that said Norman W. King did then and there have knowledge that Harry Adams, John Reid, and Herman Miller, whose true names are to the grand jury unknown, did on the first day of March, A. D. 1901, at the city of Minneapolis, in said Hennepin county, then and there being, wilfully, unlawfully, wrongfully, knowingly, and feloniously take, steal, and carry away in the nighttime of said day, from the person and possession of one John S. Hooper, one diamond stud, of the value of one hundred and ten dollars; a more particular description of said property being to the grand jury unknown; said property being then and there the property of, in the lawful possession of, and on the person of the said John S. Hooper,—with intent then and there had and entertained by them, the said Harry Adams, John Reid, and Herman Miller, and each of them, to deprive the said John S. Hooper, the true owner of said property, of his said property, and to appropriate the same to the use of them, the said Harry Adams, John Reid, and Herman Miller; that the grand jury of Hennepin county, Minnesota, at the city of Minneapolis, in said county and state, on the eighth day of April, A. D. 1901, duly returned an indictment against the said Harry Adams and

John Reid of having committed the crime of grand larceny in the first degree, committed as follows: The said Harry Adams and John Reid on the first day of March, A. D. 1901, at the city of Minneapolis, in said Hennepin county, then and there being, did wilfully, unlawfully, wrongfully, knowingly, and feloniously take, steal, and carry away in the nighttime of said day from the person and possession of one John S. Hooper one diamond stud, of the value of one hundred and ten dollars, a more particular description of said property being to the grand jury unknown; said property being then and there the property of, in the lawful possession of, and on the person of said John S. Hooper,—with intent then and there had and entertained by them, the said Harry Adams and John Reid, and each of them, to deprive the said John S. Hooper, the true owner of said property, of his said property, and to appropriate the same to the use of them, the said Harry Adams and John Reid."

Then follow further allegations of knowledge on the part of defendant King, and that he aided and assisted Adams to escape trial and conviction.

The form of this indictment is not to be commended, though we think, after careful consideration of the objection made against it, that it sufficiently charges the commission of a felony by Adams, not by way of inference, but by distinct, positive allegations, and that the objection to it was properly overruled. The introductory part of the indictment charges that defendant had knowledge that Adams, Reid, and Miller did wrongfully and unlawfully take, steal, and carry away, in the nighttime, a diamond stud from the person of one Hooper. This is, perhaps, not a direct allegation that Adams, Reid, and Miller took and carried away the diamond, but, instead, an averment that defendant knew that they had done so, and the facts in reference to the commisssion of the crime by those parties,—a recital of what defendant had knowledge of. But further on it is distinctly charged that the grand jury indicted Adams and Reid, accusing them of having committed the crime of grand larceny in the first degree, "committed as follows," and then follow explicit and direct averments of all facts essential to an indictment for the crime stated. The words "committed as follows," following the allegation that Adams and Reid were indicted by the grand jury, are equivalent to "which said crime was by them committed as follows." So that if the first part of the

indictment, which we have characterized as introductory, be construed as referring to the crime committed by Adams and Reid by inference and recital only, or be wholly rejected as surplusage, the part we have just referred to, not being dependent upon the preceding allegations, distinctly charges not only that defendant knew that Adams had committed a felony, but all the facts and elements essential to constitute such a crime. We therefore hold the indictment sufficient.

2. After the arrest of Adams, his brother Charles, upon being informed thereof, and upon the statement of defendant that the only way he could secure his release was to return the stolen diamond, raised money by subscription to purchase it from the person to whom the thieves had sold it,—actually obtained it by the assistance of one Edwards, and delivered it to a saloon keeper named Murphy, to be delivered subsequently to defendant to effect the release of the imprisoned Adams.

The admission of this evidence is assigned as error. It was properly objected to on the trial. The contention of defendant is that what young Adams and Edwards did in that respect was not known to defendant, nor did he in any way participate therein; that the evidence in no way tended to show the guilt of Harry Adams, or a knowledge of his guilt in defendant. Perhaps it did not tend to show the guilt of Adams, but, connected with other evidence in the case, it was important as bearing upon the question whether the stolen diamond was actually recovered from the thieves, and finally delivered to defendant,—a link in the chain of circumstances surrounding defendant which had a very pertinent bearing upon the question of his guilt,—and was clearly admissible. No conversations had with third persons in reference to raising the money were related,—simply what was done in that respect. Facts, and not statements of others, were substantially all the court permitted the witness to testify to. The evidence was followed by further testimony that, subsequent to the delivery of the diamond to Murphy, it was returned to young Adams and Edwards, and by Edwards delivered to defendant. Other evidence, besides, tends to show that defendant had knowledge of what was being done in that respect. He informed Hooper that

efforts were being made to recover the diamond by raising money to reimburse the person who then held it.

3. It is also contended by defendant that the court erred in permitting Harry Adams to testify to the fact that after the five persons had returned from the Great Western Depot, where the diamond was stolen, one of them (Sargent) had a diamond stud in his possession, which he sold, dividing the proceeds ($40) among them.

It is urged by defendant's counsel that this is the only evidence tending to connect Adams with the larceny of the diamond, and, in effect, but an admission by the principal, and inadmissible against defendant, the alleged accessory, in the absence of evidence in corroboration. But counsel are in error in their statement that this is the only evidence to connect Adams with the commission of the crime. There is no dispute but that Adams was present with the other parties at the Great Western Depot at the time the crime was committed; no question but that he entered the car with them, and was connected with all that took place, left the car with them, and returned immediately to the saloon where the diamond was exhibited, and where the proceeds from its sale were divided. Adams was corroborated by Reid, who testified substantially to those facts, and by numerous circumstances disclosed by the evidence.

If the testimony as to the sale of the diamond and the distribution of the proceeds among the five men was the only evidence to connect Adams with the theft, the position of counsel for defendant would perhaps be correct; but other evidence points with reasonable certainty to the fact that those five men went to the depot at the time in question for the very purpose of committing some crime of this nature, and that they jointly aided and abetted each other in the theft complained of. The evidence was admissible. State v. Rand, 33 N. H. 216; State v. Ricker, 29 Me. 84; Buck v. Commonwealth, 107 Pa. St. 486.

4. It is urged that the court erred in refusing to permit defendant to prove the fact that the state's witness Edwards was a confirmed opium eater, and had been addicted to its use for years,

and, further, that the use of opium renders the user unreliable in his statements and prone to falsehood.

We are of opinion that the court ruled correctly on this question. Whether the witness was a confirmed opium eater or not, or whether the indulgence renders the user unreliable and untruthful in his statements, was a collateral issue, which the court properly declined to try. The witness was before the court. His mental condition was obvious to both court and jury, and it was for them to say whether he was in condition of mind to understand and appreciate his testimony, whether he was fabricating, or whether his testimony was straightforward and unequivocally given. His appearance, demeanor, and the manner in which he gave his testimony were sufficient to inform the jury of the condition of his mental faculties, and from which they could judge of his credibility. State v. Hayward, 62 Minn. 474, 65 N. W. 63.

5. A witness named Johnson was called by defendant and examined concerning certain features of the case. During the examination the court reprimanded and threatened him with punishment for contempt, for what it deemed the purpose of the witness to interpolate and inject evidence into the case not called for by questions put to him, and which the witness knew to be objectionable. The remarks on this subject were as follows:

"The Court: It is perfectly apparent to me that he is trying to interpolate evidence in this case that he knows is objectionable. He sat here during this trial, and he is evidently an extremely smart man and understands about this case, and he is trying to get evidence into this case, apparently, that is inadmissible; and, if he persists in doing so, I shall punish him."

To these remarks, counsel for defendant took an exception.

An examination of the testimony of this witness discloses the fact that, to say the least, he was friendly to defendant, and evidently hoped that his testimony would aid in his acquittal in a substantial degree. His answers were not always confined to responsive matters, but included statements not called for, or really pertinent to the questions asked him. The learned trial judge, no doubt, became out of patience with his conduct; and for the purpose of rebuking him, and admonishing him to limit his

answers to matters pertinent to the questions, and desist from volunteering information, the remarks complained of were made. The court did not reflect upon the character of the witness for truthfulness, or suggest that his testimony was untrue or unworthy of belief, but simply that the witness was volunteering information not called for, which the court deemed improper.

Of course, had the court reflected on the credibility of the witness in any way, just ground for complaint would be presented; but as no such reflection was intended, nor were the remarks of the court susceptible of such a construction, we think the error assigned not prejudicial, and no ground for a new trial. Trial courts often find it necessary, and it is a discretionary right and duty, in the interests of an orderly trial, to rebuke and in a measure suppress overzealous or overwilling witnesses, and at times with emphasis; and their right and duty to do so cannot well be questioned or curtailed.

6. Defendant also complains that the court erred in permitting the state to offer evidence in rebuttal as to a conversation had between Attorney Mead and defendant in respect to a bail bond to secure the release of Adams from arrest.

It appears from the record that Mead prepared a bail bond for Adams, and that he did so on the suggestion of defendant. This evidence was proper, as bearing upon the question whether defendant aided and assisted Adams to escape punishment for his crime. It was a circumstance to be considered by the jury in connection with all other circumstances in the case, and was properly received. Whether the evidence was properly admissible in rebuttal is not important. It was clearly in the discretion of the court to permit the state to offer it so, and no abuse of discretion appearing, though perhaps not strictly admissible in rebuttal, its ruling was not reversible error.

The same may be said in respect to the twenty-sixth assignment of error, where Hooper was permitted to testify in rebuttal that defendant instructed the witness to keep away from the office of the county attorney in reference to the Harry Adams case. This evidence was admissible as a link in the chain of circumstances tending to show the guilt of defendant, and was properly received.

7. Witness Hooper testified on the part of the state that, some two years prior to the time the diamond in question was stolen from him, he had a conversation with one Cohen, a dealer in jewelry in Minneapolis, in reference to the weight and value of the diamond. He testified that Cohen stated to him that the diamond weighed a carat and a quarter and a sixteenth, and that it was worth $110. Defendant called Cohen as a witness, and examined him in reference to this conversation, and he denied having made some of the statements testified to by Hooper. On his cross-examination the state was permitted, over the objection and exception of defendant, to go at great length into the history and character of the witness, and the character and business of members of his family. He was asked if he was not interested in the result of the prosecution, whether he had not two brothers who were members of the Minneapolis police department, and whether one of them had not been acting as a "go-between" for the city administration in collecting unlawful assessments from gamblers and abandoned women.

Counsel for defendant contended on the argument before us with much earnestness that this was highly prejudicial to the rights of defendant, and prevented him from having a fair trial, and that a new trial should be granted for this reason, if for no other. We have examined the record on this subject with care, and are unable to agree with defendant's contention. There was no controversy on the trial as to the value of the diamond,—at least, none that would tend to reduce the crime alleged to have been committed by Adams from a felony to a misdemeanor. The felonious taking of property of any value from the person of another in the nighttime is grand larceny in the first degree. The diamond in question was stolen from the person of Hooper in the nighttime. He testified that it was worth $110, and no claim was made that it was of no value whatever. Cohen's testimony was to the effect that he did not state to Hooper that it weighed a carat and a quarter and a sixteenth, and that he did say to him that it was worth from $70 to $75. This testimony was wholly immaterial, and not competent for impeaching purposes, because not

pertinent to any material issue in the case, and should have been excluded by the trial court.

The extent to which a cross-examination for the purpose of testing the credibility, or showing the bias, prejudice, or hostility, of a witness, may be carried, rests in the sound discretion of the trial court, with the exercise of which a court of review will not interfere except in a clear case of abuse. While it seems somewhat difficult to understand upon what theory the trial court in the case at bar permitted the state's attorney to go into the character of members of the family of this witness, and conceding, without so deciding, that the examination went too far, still we are unable to see how defendant was prejudiced by it. Where a witness has given testimony which is competent upon a material issue, it might, perhaps, be held an abuse of discretion to permit a cross-examination of the sort indulged in in this case for the purpose of discrediting him. It is permissible, of course, in any case, to inquire whether a witness is interested in the result of the action on trial, and as to other matters tending to disclose his bias, prejudice, or to discredit him; but because he may have a brother or some other relative who is not of good character, and in no way connected, even remotely, with the action on trial, does not necessarily tend to his discredit. But in the case at bar the witness gave no testimony in any way material to the issues in the case, and whether he was discredited by the examination, or not, could in no way prejudice defendant. He was deprived of nothing in respect to the weight and credit to be given the testimony of the witness, because it was immaterial and irrelevant.

8. Defendant's motion for a new trial embraced, among other grounds, that of misconduct of the jury. In support of this an affidavit was submitted tending to show that some of the jurors indulged in the use of intoxicating liquor during the trial of the action, but there was no showing that they did so in point of fact. At the hearing of the motion, defendant sought to have the jurors examined orally in court touching the charge against them of misconduct. The court refused the application to examine them thus, and of this defendant complains.

The rules of law applicable to misconduct of this nature are very fully stated in the case of State v. Salverson, 87 Minn. 40, 91 N. W. 1. It was there held that the use of intoxicating liquor by a juror pending the trial of an action is not misconduct justifying a new trial, in the absence of a showing that the juror was incapacitated for an intelligent consideration of the case. There is no claim made in the case at bar that any of the jurors were in any degree intoxicated, or in any measure unfitted for service, and no showing, except by inference, that any of them in fact indulged in such liquor. The principal error complained of in this connection is the refusal of the court to permit the jurors to be orally examined upon this subject. If it be conceded that the misconduct complained of might be shown by affidavits of the jurors (it occurred, if at all, in the jury room), defendant had no absolute right to have them examined orally in open court. Whether they should be so examined was a matter resting in the sound discretion of the trial judge. Strom v. Montana Cent. Ry. Co., 81 Minn. 346, 84 N. W. 46.

9. We come next to a consideration of the evidence, and are required to determine whether it is sufficient to sustain the verdict of guilty. In order to justify the conviction of defendant, or the conviction of any person charged with being accessory to a felony after the fact, the state must prove by evidence, beyond a reasonable doubt, (1) the commission of the crime by the alleged principal as fully and completely as though the principal were alone on trial therefor; (2) that, with the knowledge that the principal had committed it, or reasonable ground to believe that he had, and was liable to arrest and conviction therefor, the person charged with being accessory after its commission harbored, aided, abetted, or assisted him to escape trial and conviction. It is contended in the case at bar that the state failed to establish either proposition by any sufficient, competent evidence.

The facts tending to show that Adams, the alleged principal, was guilty of the crime of grand larceny, may be summed up, without a detailed statement of the evidence,—simply giving the conclusions the jury might reasonably have drawn therefrom,—as follows: On March 1, 1901, the Roosevelt Marching Club was at

the depot of the Great Western Railway Company in the city of Minneapolis to start on a journey to Washington, D. C., to participate in the inaugural ceremonies on the fourth of the month. They had obtained berths in the sleeping car, and were all aboard, including Hooper, a member of the club, at about the leaving time of the train. At the same time, and for no particular legitimate purpose, Harry Adams, the principal named in the indictment, John Reid, Herman Miller, Samuel Sargent, and King White were also at the depot, and, just as the train was about to depart, boarded the sleeping car in which Hooper had his berth. The five persons named entered the car, and one of them pulled down the upper berth, where Hooper was seated; giving to the act an accidental appearance, though it was in reality done, no doubt, designedly, and for a purpose. He immediately attempted to raise it to its place, and, with the assistance of Hooper's companion, succeeded in doing so. During these proceedings the intruders crowded about Hooper, and while the latter was standing in the aisle of the car, where the berth had been lowered and was being raised to its place, the diamond stud was taken from his necktie by one of them. Adams and his associates then left the car, returning into the city, and to a saloon, where the diamond was exhibited and examined.

Adams was sworn as a witness on the trial, and testified that he did not know how or when the diamond was stolen,—whether when the parties were in the car, or not. Reid, one of the parties, was also sworn, and he testified substantially the same. But it appears beyond doubt that it was taken from the person of Hooper at that time, and as a result of the concerted action of Adams and his associates. Those parties were out for a purpose on this occasion, and the circumstances shown by the record point with unerring certainty to the fact that their entrance into the sleeping car, and the simulated difficulty with the berth, were preconceived and the result of deliberate plans,—not, perhaps, of stealing Hooper's diamond, but for the purpose of stealing anything that they could easily find an opportunity to take. As soon as the diamond had been taken (the whole proceeding did not take to exceed five minutes), the parties left the car together, except that Adams was

perhaps a little behind the others in getting off, and met almost immediately, and proceeded down the street to a saloon, where they divided the proceeds obtained on the sale of the stolen article. We have no doubt whatever of the sufficiency of the evidence to show the guilt of Adams, as well as the guilt of the other parties jointly concerned with him.

We come then, to the question whether defendant knew of the commission of the crime by Adams and his associates, or had reasonable grounds to believe they had committed it, and whether with that knowledge he aided and assisted Adams to avoid and escape trial and conviction. The evidence on this subject is not so clear, perhaps, as upon the first question, though, after a patient and painstaking examination of it, we are satisfied that it is sufficient to sustain the verdict. Defendant was the chief of detectives of the city of Minneapolis, and was informed of the crime soon after its commission. Hooper visited him frequently, and urged him to make every effort to ferret out the criminal and recover the stolen diamond. That he made efforts in that direction is shown by his own testimony, though he testified that the case was in the hands of other detectives, and whatever he did in the matter was done in an "advisory capacity." He was informed that the county attorney looked to him for evidence on which to convict Adams, and he instructed Hooper to keep away from the county attorney's office; thus leading him to understand that defendant was doing and would do all that could be done in the matter. He suspected Adams and Reid of being implicated in the crime, and ordered their arrest, but, upon the assertion of their innocence, directed Reid to be proceeded against, and released Adams.

Both these parties were indicted, and, subsequent to the time Adams was committed to jail, a brother of the prisoner learned of the fact, and was anxious to release him from prison. Defendant informed him that the only way he could obtain his liberty would be by returning the Hooper diamond. The young man stated that he did not believe his brother guilty of the crime, but defendant replied that he knew better, and knew that he was guilty. Young Adams, assisted by one Billy Edwards, then undertook to raise, and succeeded in raising, money with which to buy

the diamond from the person who then held it (one Flick), for the purpose, as is claimed by the state, of turning it over to defendant in consideration of his efforts to shield and protect Adams from conviction and punishment. They obtained the diamond from Flick, and Edwards testified very distinctly that he went to Moss Bros.' saloon, the place appointed by defendant for the purpose, and there delivered to him the diamond upon his (defendant's) agreement that Adams should not be prosecuted. Edwards is corroborated in a measure in this statement by young Adams, who went with him to Moss Bros.' saloon for the purpose of delivering the diamond to defendant; but he did not, in fact, see it delivered.

It is urged that Edwards' suggestion to Adams that he remain out of the saloon when the diamond was delivered is a strong circumstance tending to show that, as a matter of fact, it was not delivered to defendant, but kept by Edwards himself. But this is not necessarily so. Thieves and other transgressors of the law act, as a rule, in secret, and Edwards' environment and his long association with classes of that character were such as to suggest the necessity of secrecy in delivering the diamond to defendant; and on that theory, no doubt, Adams was not permitted to be present as a witness. One thing is significant in this connection, and that is that, after the date on which it is claimed the diamond was delivered to defendant, all efforts to recover it for Hooper seem to have ceased. The time of the delivery was fixed by the witnesses as about August 20, and it is urged that defendant was not in the city at that time, but, on the contrary, was at Duluth, or somewhere on Lake Superior. He established by reasonably clear evidence the truth of this contention; that is, that he was absent from the city for several days at about that date. But allowance must be made for defects in the memory of witnesses as to dates, and the jury were not required to find that the diamond was delivered at the precise date named by the state's witnesses. They were not specifically positive as to the date.

A few days before the opening of the term of court at which the indictment against Adams would come on for trial, and subsequent to the date when it is claimed the diamond was delivered to defendant, the assistant county attorney called him up over the

telephone, and inquired whether he could furnish any evidence for the conviction of Adams. He replied that he could not, though he had previously stated to Hooper that Adams was one of the guilty parties; and he was undoubtedly in possession of all the facts showing his connection with the theft, and when, if Edwards is to be believed, he had the stolen property in his possession. The indictment was then dismissed, and Adams discharged. The claim that defendant aided and assisted Adams to escape conviction and punishment is further corroborated by witness Hall, who was attorney for Adams. This witness testified that he had a conversation with defendant in reference to the Adams case, wherein defendant said:

"That case won't bother you at all. You will have no trouble about that case. The fellow that lost the diamond either cannot or will not identify Adams."

The witness in a subsequent conversation stated to defendant that he understood that the diamond had been delivered to him (defendant), and he was asked why he did not return it to Hooper. Defendant denied that he had the diamond, but his manner and what he said rather corroborate the contention of the state that his denial was not true. Hall suggested that it be returned to Hooper; that, if an arrangement had been made by which Hooper was to receive it in consideration of the release of Adams, it should be carried out. To this suggestion, defendant replied, "Oh, what in —— can Hooper do?" It is fair to defendant to say that he denied having made this statement, but the truth was for the jury to determine.

Subsequent to the dismissal of the indictment against Adams he was again arrested, and was released on bail furnished at the instance of defendant. At least, the evidence was such as to justify the jury in so finding. Without consultation with Adams, defendant engaged Attorney Mead to prepare a bail bond, and friends of defendant signed it without solicitation from Adams or his relatives.

But we need not review the evidence further. It is sufficient to say that from our examination of it, carefully made, we conclude

that it is sufficient to sustain the verdict of the jury to the effect that defendant had knowledge of the fact that Adams was guilty of the crime charged against him, and that he deliberately aided and assisted him to escape trial and conviction. It was his duty to take active measures to secure the arrest of the guilty parties, and the jury was justified in finding that he led Hooper and the county attorney's office to believe that he was doing all that could be done to capture and convict them. That he knew that Adams was one of them, he repeatedly stated to Hooper, yet he withheld from the state the facts on which he founded this statement, and furnished no evidence to secure his conviction, but, on the contrary, whatever efforts were made by him were to aid and assist Adams. The evidence may not be said to show conclusively that defendant had knowledge that Adams was guilty of the offense charged, but the jury was fully justified in finding that he had reasonable grounds to believe him guilty, which, in a case of this kind, is equivalent to knowledge, and sufficient on which to base a conviction. Section 27, Penal Code (G. S. 1894, § 6311).

Defendant contends, and not wholly without reason, that the witness Edwards, upon whose testimony the state largely relied for conviction, and particularly in respect to the delivery of the diamond to him, is wholly unreliable and unworthy of belief. It may be conceded, in accordance with defendant's contention, that Edwards was an all-round thief and confidence man; that he had been convicted repeatedly of crimes, particularly of gambling, and had been a lawless character for a number of years. But whether he was entitled to credit—whether his testimony was worthy of belief—was a question for the jury to determine. Witnesses were called to contradict him, and they testified that he attempted to sell the diamond to one Murphy. But whether he attempted to do so is not of serious importance, as the fact remains that he did not sell it to him. It is also claimed that he attempted to sell it at Moss Bros.' saloon at the time he claims to have delivered it to defendant. A witness by the name of Johnson was called and testified to that fact. This witness was another all-round thief and ex-convict, and probably as reliable and as credible as the witness Edwards. They were both in the same business,—men of

the same character,—and whether one was to be believed in preference to the other was for the jury to say. Both were before them, and their demeanor while on the stand, and the probability or improbability of the story told by each, were for the jury to consider in connection with all the circumstances tending to disclose the truth.

Order affirmed.