Chief Judge Conway.
The defendant Walter Williams was convicted of selling a quantity of heroin at his home to one James Giles on the evening of July 17, 1956. Giles, the prin *21 cipal witness for the People, testified to the actual sale by the defendant, and his testimony was substantially as follows. At about 5:30 p.m. on the day in question Giles telephoned the defendant at his home and, during a cryptic conversation in which they spoke in terms of laundry, the defendant told Giles how to come by bus to his home in East Elmhurst, Long Island. Giles came from Manhattan to the defendant’s home and arrived there at approximately 7:00 p.m. He was greeted at the door by the defendant, and the two of them went into the defendant’s living room where he received a package of heroin from the defendant for which he paid $10 and promised $10 more. They had a conversation during which the defendant told Giles that one Jackson, from whom Giles had been buying narcotics, had been drinking heavily and was no longer responsible. He told Giles that he was thereafter to buy the narcotics from the defendant himself or his wife at their home, and that Giles was to call him before coming to his home but was never to speak in terms of narcotics but rather in terms of laundry, washing windows or something to that effect. Giles left by the back entrance, returned to Manhattan by bus, and at 125th Street and Lexington Avenue entered a taxicab when he was apprehended by three detectives who had followed him from defendant’s home. Except for the actual purchase in the defendant’s home, Giles’ testimony was substantially corroborated by three detectives, assigned to the Narcotics Squad, who had been keeping the defendant’s home under surveillance. These detectives testified that they monitored a tap on the defendant’s telephone pursuant to court order for what appears to have been at least 15 days before the day in question; that they waited for Giles to come to the defendant’s home and kept him under observation as he went to, and entered, the defendant’s homej-and that they followed Giles as he left the defendant’s home and along his bus trip to Manhattan where they apprehended him, took him to the police station, and found on his person a package of white powder which proved to be heroin. Other witnesses for the People testified to such things as the affidavit upon the basis of which a Supreme Court Justice signed an order authorizing a wire tap on the defendant’s phone, the installation of the wire-tap equipment, the analysis of the white powder found on Giles’ person, and the arrest of the defendant on August 28, 1956.
*22 At the trial the credibility of Giles was strenuously attacked by defense counsel. One attempt at impeachment was based upon Giles’ history of narcotic addiction. For about five years prior to the sale in question, Giles had been addicted to the daily use of heroin by introducing the drug hypodermically into his veins and muscles. However, he took no such injections on the day in question nor at any time thereafter up to and including the day he testified. He had been in jail all of this time — a period of about four months. After his arrest on the day of the sale the police did permit him to receive two injections of “ dope ” at Bellevue Hospital. But at no time since then had he received in any manner a narcotic drug of any kind. Furthermore, he testified at the trial that he was no longer addicted to narcotics. This was the posture of the ease relating to Giles’ addiction when the defendant called a physician to the stand to give testimony on the effects of narcotic addiction upon the veracity of addicts.
The questions propounded to this doctor were extremely vague. Thus, defense counsel asked the doctor to give his opinion on the “characteristics” and “personality changes” of an addict, and on whether “ a person addicted to [drugs] is — as a mainliner — can testify to facts in a normal manner ”. Prosecution objections were sustained. The Trial Judge appears to have been most patient in this matter, and he made several attempts to ascertain the purpose of these questions. Defense counsel first explained his purpose in this way: “ My purpose is this, your Honor. The question of the credibility of the witness Giles based on medical experience and opinion of this doctor.” His next explanation was that part of his purpose was to have the doctor testify as to whether or not Giles was telling the truth. Later he told the court, “ I want him to give us a medical opinion as to the characteristics of a person who is addicted to heroin as a mainliner ’ ’, and he said, 1 ‘ I submit I have a right to show this Jury by medical proof that a person such as Giles who is addicted to heroin, because of his condition is not worthy of belief.” And his last explanation was: “I’m not talking about credibility, your Honor. I’m talking about medical opinion.” Throughout the examination of this witness and the intervening colloquies, the Trial Judge insisted that this witness could not pass upon the credibility of another *23 witness, and that Giles’ credibility was solely for the jury to determine. It is upon this record that appellate counsel now strenuously argues that the exclusion of this doctor’s testimony is prejudicial error.
It is a cardinal and well-settled principle that offers of proof must be made clearly and unambiguously. “Before a party excepts on account of the rejection of evidence, he should make the offer in such plain and unequivocal terms as to leave no room for debate about what was intended. If he fail to do so, and leave the offer fairly open to two constructions, he has no right to insist, in a court of review, upon that construction which is most favorable to himself, unless it appears that it was so understood by the court which rejected the evidence.” (Daniels v. Patterson, 3 N. Y. 47, 51, emphasis added; see, also, Hellreigel v. Manning, 97 N. Y. 56, 60-61; Young v. Anthony, 119 App. Div. 612, 618 [dissenting opinion]; 6 Carmody-Wait, New York Practice, pp. 540-541.) And the eloquence of appellate counsel must bend to the weight of the record whether it be favorable or unfavorable to his argument. We have carefully examined this record to ascertain the Trial Judge’s understanding of the offers of proof here. He repeatedly ruled that this doctor could not testify flatly that Giles was not telling the truth. We discover further, during defense counsel’s summation, a statement by the Trial Judge that the main purpose of this doctor was “ to establish that an addict could not tell the truth.” The record permits no broader review in this regard, therefore, than upon the following two questions: Was it error for the Trial Judge to exclude the doctor’s testimony (1) that main-liners addicted to heroin are unworthy of belief; and (2) that, therefore, Giles was unworthy of belief? There is no question properly presented here regarding the admissibility of expert testimony on the effects of narcotic addiction upon the memory or perceptive powers of the addict.
Taking the second question first, we hold that the Trial Judge was clearly correct in refusing to permit the doctor to testify flatly that Giles’ testimony was not entitled to credit. Just as the Trial Judge ruled, whether or not Giles was telling the truth was a conclusion to be drawn solely by the jury, and an opinion which was exclusively their province to render. Upon this point there can be no doubt, and accordingly this court *24 is unanimous in so holding. Returning to the first question, that is the one concerning which we are not all in agreement. The only proof here, as noted earlier, is that Giles had taken no narcotics of any kind for about four months before the trial, and that he was no longer addicted to drugs. However, defense counsel attempted to show that Giles was still using narcotics by describing to the doctor Giles ’ behavior on the witness stand and asking him whether such behavior evidenced the influence of, or addiction to, narcotics. A prosecution objection was sustained. In view of this, we assume that the doctor would have been able to testify affirmatively, and accordingly we reach the question of whether a doctor may testify that narcotic addicts are unworthy of belief in the sense that they are, in the words of appellate counsel, pathological liars.
We have carefully examined numerous authorities upon the subject of impeachment of witnesses by proof of drug addiction and its effects. (See Wilson v. United States, 232 U. S. 563; Chicago & N. W. Ry. Co. v. McKenna, 74 F. 2d 155; 158; Kelly v. Maryland Cas. Co., 45 F. 2d 782, affd. 45 F. 2d 788; People v. Webster, 139 N. Y. 73; Standard Oil Co. v. Carter, 210 Ala. 572; People v. Bell, 138 Cal. App. 2d 7, 10; Webb v. People, 97 Col. 262; Nelson v. State, 99 Fla. 1032, 1038; Eldridge v. State, 27 Fla. 162, 183; Gordon v. Gilmore, 141 Ga. 347; State v. Fong Loon, 29 Idaho 248; People v. Hamby, 6 Ill. 2d 559; People v. Crump, 5 Ill. 2d 251; Williams v. United States, 6 Ind. Terr. 1; State v. Prentice, 192 Iowa 207; Markowitz v. Markowitz, 290 S. W. 119, 122 [Mo. App.]; State v. King, 88 Minn. 175; State v. Gleim, 17 Mont. 17; Effinger v. Effinger, 48 Nev. 205; State v. Juliano, 103 N. J. L. 663; Cannon v. Territory, 1 Okla. Cr. 600; State v. Jordan, 146 Ore. 504; Katleman v. State, 104 Neb. 62, 64; Commonwealth v. Morrison, 157 Pa. Superior Ct. 366; Franklin v. Franklin, 90 Tenn. 44, 49; Beland v. State, 86 Tex. Cr. Rep. 285; Anderson v. State, 65 Tex. Cr. Rep. 365; Lankford v. Tombari, 35 Wn. [2d] 412; State v. Smith, 103 Wash. 267; State v. Schuman, 89 Wash. 9; State v. Concannon, 25 Wash. 327; State v. Robinson, 12 Wash. 491; State v. White, 10 Wash. 611; 3 Wigmore, Evidence, § 934; 15 A. L. R 912; 52 A. L. R. 2d 848; 98 C. J. S., Witnesses, § 513, p. 420; 70 C. J., Witnesses, §§ 926, 1080; 58 Am. Jur., Witnesses, § 705; 3 Ore. L. Rev. 81; 16 So. Calif. L. Rev. 333.) Of the cases upon the point raised here, *25 while some tend to support the admissibility of such evidence (State v. Fong Loon [Idaho, 1916], supra; Effinger v. Effinger, supra; cf. Markowitz v. Markowitz, supra; Anderson v. State, supra), we think it is fair to say that the preponderance holds such testimony to be excludable. (Williams v. United States, supra; Kelly v. Maryland Gas. Co., 45 F. 2d 782, affd. 45 F. 2d 788, supra; People v. Bell, supra; State v. Robinson, supra; Cannon v. Territory, supra; Katleman v. State, supra; State v. King, supra.) Except for State v. Fong Loon and Kelly v. Maryland Gas. Co. there is very little written in the cases upon the subject. In the Fong Loon case, decided in 1916, the court held as reversible error the refusal of the Trial Judge to permit cross-examination of a witness as to his use of opium and yen she. The court further held that independent proof is admissible to show what if any effects the use of drugs had ‘@ or was more than likely to have upon the mental balance of this witness, the truthfulness of his testimony, and his capacity to remember * # (P. 258, emphasis added.) The court considered it to be common knowledge that narcotics addicts are ‘1 notorious liars ’ ’ and that £ ‘ The habit of lying comes doubtless from the fact that the users of those narcotics pass the greater part of their lives in an unreal world, and thus become unable to distinguish between images and facts, between illusions and realities.” (Ibid.) In support of this view the court quoted from a medical treatise of earlier vintage as follows: “In Wharton & Stille’s Medical Jurisprudence, 3d ed., sec. 1111, it is said that £ Of the mental symptoms, ’ in the case of a morphinomaniac or other habitual users of drugs, ‘ the most characteristic, perhaps, are the moral perversions. The chronic morphinomaniac is often a confirmed liar. The truth is not in him, . . . There is something quite pathological in this mendacity; the lying is unblushing, inexpert, spontaneous, — a sort of second nature. . . . They have been so often narcotized, and thus cut off from actualities, living in a dream-state, that they do not seem able to recognize realities when they see them. ’ ” (Ibid.) In the later Kelly case (45 F. 2d 782 [U. S. Dist. Ct., W. D., Va.]), decided in 1929, it was offered to have a physician testify as follows: 1 £ My opinion is that an excessive use of morphine, such as indicated, might tend to undermine the morale df a person, especially for truthfulness, and make *26 them, cunning. It also tends to make them unreliable. I might also say that a drug addict might feign anything.” (p. 783). This was held inadmissible. The court very carefully examined numerous treatises on the subject of narcotism and its relation to veracity, and concluded: ‘ ‘ On the mere reading of the foregoing excerpts it is manifest that there is now no consensus of medical opinion to the effect that morphine addicts are usually abnormally untruthful in respect to matters not connected with the vice.” (p. 785). These cases, of course, are opposed in their conclusions. But they do have a common ground in their approach, each recognizing that the rule of evidence depends upon scientific acceptance of the opinion offered.
The question presented here has never been decided by this court nor, as far as we are able to ascertain, by any other court in this State. This is truly a question of novel impression, of considerable difficulty, and it is only after long and serious deliberation that we hold inadmissible expert testimony that narcotics addicts of the same type as a witness are unworthy of belief in the absence of a clear and convincing showing to the full satisfaction of the Trial Judge that such is the consensus of medical and scientific opinion. The reliability of such a thesis must be clearly established before a jury may be subjected to its influence.
It is true there is usually no requirement that before an expert may give an opinion he must demonstrate that most, all, or many other experts would agree. But the expert, testimony preferred here is not usual at all. It is not as to a fact in issue, as such, but as to a collateral matter, viz., the credibility of a witness. Credibility is, as the cases have repeated and insisted from the dawn of the common law, a matter solely for the jury. Cases frequently turn upon what credence the jury gives to a particular witness. In a case such as this where only one witness has testified to the crime, the case stands or falls according to the jury’s opinion of his credibility. And in a case involving a narcotics charge the principal witness will very often be an addict. The necessity, therefore, for caution in expanding in this case upon the settled and well-tested methods of impeachment becomes apparent. Such expert testimony would unquestionably have great impact upon a jury and, to *27 some unknowable extent, replace their judgment by the opinion of the expert which, it is essential to note, is an opinion, at least in form, of the credibility of a class and not of the witness himself. And the inference would be that the witness, because he is a member of a class, is himself mendacious and unworthy of belief. Quite obviously, therefore, it is essential that the generalization be more than one man’s opinion.
The foregoing leads also to this consideration. How complex and confusing would a trial become for the jury if it were faced with conflicting expert opinions, each with scientific authority to support it, upon the collateral matter of credibility. The first question would be the credibility of the experts, and then the credibility of the witness. The battle of the experts might well be such that the jury would lose sight of the issues or, at the very least, would tend to regard the opinion of the expert as determinative of the credibility of the witness rather than to consider it only as one factor of many to be considered in concluding whether a witness is telling the truth. Laymen, even with the aid of a charge by the court, may not reasonably be expected to apply all of the refined legal reasoning which would be necessary to place such testimony in its proper perspective and give it only its limited significance. It was with good reason, therefore, that other courts have declined to permit such testimony on the ground that it overdevelops a collateral matter and tends to obscure the real issues (State v. King, 88 Minn. 175, supra; Katleman v. State, 104 Neb. 62, 64, supra). But we do not go so far here as to hold that such expert testimony may never be admissible only because it is upon a collateral matter. For justice would seem to require that, if it is demonstrated to be the scientific consensus that addicts are unworthy of belief, the defendant is entitled to place that fact before the jury. As the learned Professor Wigmore wrote: ‘ ‘ There must first be proof of general scientific recognition that they [scientific methods of determining credibility] are valid and feasible.” (3 Wigmore, Evidence, § 875, p. 368.) If there were general scientific recognition of the thesis that narcotics addicts are generally unworthy of belief, that at least would warrant the influence of the expert upon the jury and would, we think, tend to avoid or at least reduce conflicting expert opinion.
*28 The caution which we exercise here is justified by scientific-works. Dr. Lawrence C. Kolb, reputed to be one of the world’s leading authorities upon this subject (De Ropp, Drugs and the Mind, p. 145. The author states that Dr. Kolb’s knowledge is “ unexcelled ”. [p. 149]), has this to say: “ No addict who receives an adequate supply of opium and has money enough to live is converted into a liar or a thief by the direct effect of the drug itself.” (9 Mental Hygiene 74, 75.) And we find in a treatise co-authored by Dr. Kolb and published in 1958 the foEowing: “ This moral and social deterioration is not a result of the direct effect of narcotics * * (Noyes & Kolb, Modern Clinical Psychiatry 567.) We read elsewhere: “ * * * I find them [narcotics addicts], as a class, not too unpleasant to deal with and not as completely dishonest as one is led to believe * * (Hawkins, Opium Addicts and Addiction 40 [1937].) Again, Dr. Kolb writes: “In one group of twenty-five professional men who were carefuEy studied from the standpoint of deterioration, seventeen had suffered no apparent mental or moral deterioration.” (Kolb, Pleasure and Deterioration from Narcotic Addiction, 9 Mental Hygiene 699, 713.) It is stated by another: “ What is true of one man who has opiate addiction may be absolutely false of another. One narcotic addict is honest, competent, truthful and inteEigent. Another is dishonest, incompetent, untruthful and incapable of appreciation or self-control. Neither the one set of attributes, nor the other, is pecuEar to narcotic addicts. They are simply personal attributes possessed by different men and types of men who may or may not be narcotic addicts.” (Bishop, The Narcotic Drug Problem, pp. 23-24 [1920].) Similar statements or suggestions may be found elsewhere (Maurer & Vogel, Narcotics and Narcotic Addiction, pp. 216, 238 [1955]; Yost, The Bane of Drug Addiction 1 [1954]; Ausubel, Drug Addiction: Physiological, Psychological and Sociological Aspects, 38 [1958].) There is more we could add but it would only be cumulative. The foregoing is more than sufficient to establish the wisdom of the rule which we are here announcing.
It should be emphasized that the narcotic addict may be impeached in the usual manner. If his narcotism has led him to a way of life and pattern of behavior which mark him as unworthy of credit, a proper and adequate presentation may *29 be made to the jury under the existing rules governing the impeachment of witnesses. Furthermore, he is before the jury and his demeanor is the object of their scrutiny. And we cannot see that it should be any more difficult for a jury to determine the credibility of an addict than it is to detect falsehoods in nonaddicts. Here, the credibility of Giles was attacked by proof of a prior inconsistent statement, his history of addiction, a substantial record of convictions, and a searching cross-examination. In addition, defense counsel on summation conducted an unrelenting attack upon Giles’ credibility during Avhich he referred to him as an “ ex-convict ”, a “ drug addict of the first class ”, a “ first class bum ”, a “ liar ”, “ cheat ”, “ thief “ ex-procurer of men ”, and implying throughout that he Avas the instrument of the police in “ framing ” the defendant. Yet, the jury obviously believed Giles whose testimony Avas satisfactorily consistent and in many respects corroborated.
We Avill not prolong this opinion by a discussion of the other ■ arguments made by appellant. They are not persuasive, and the judgment of conviction should, therefore, be affirmed.