STATE of Missouri, Respondent,

v.

**Albert BOOTH, Appellant.**

No. 52660.

Supreme Court of Missouri,
Division No. 1.

Feb. 12, 1968.

---

Norman H. Anderson, Atty. Gen., Jefferson City, W. Scott Pollard, Special Asst. Atty. Gen., St. Louis, for respondent.

Raymond A. Bruntrager, St. Louis, William L. Mason, Jr., Galena, for appellant.

SEILER, Judge.

This case involves the question of whether testimony by a drug addict who had taken three injections of heroin of unspecified strength and size within a period of twelve hours, the last about fifteen minutes before the occurrence of the events to which he testified, constitutes substantial direct testimony that the defendant feloniously shot the deceased. We conclude it does under the facts before us and affirm the judgment.

Defendant was convicted of murder in the second degree of James Bailey and appeals. Since defendant was also charged with three previous stealing convictions, with imprisonment, which were found as a fact by the court outside the hearing of the jury, the punishment was determined by the trial judge, who sentenced defendant to imprisonment for life, Sec. 556.280, RSMo 1959, V.A.M.S.

The state's case was as follows: Robert Leo Vaughn, age 22, the state's first witness, had been addicted to heroin for about two years. He and the deceased, age 26, also a heroin addict and a close friend, would steal personal property to raise money for heroin. Sometimes they bought heroin from the defendant. Vaughn took the heroin directly into the vein in his arm, "mainlining" as he called it. The heroin was in the form of powder, to which was added water and heat. The resulting solution he would inject with a needle and syringe. He showed the jury his right arm, on which there was a blue line, extending from elbow to wrist caused, he said, from "about a thousand" such injections. He said one injection cost about $20 and he would take four or five a day. As indicated, there was nothing in the record as to the amount in an injection or its strength or purity.[1] Vaughn testified that

1. "The going New York City rate in 1965 for sufficient heroin for a single shot was reported as $15. House Hearings 264 (testimony of Robert F. Walsh, Assistant District Attorney of Kings County, New York). As a result of stringent law enforcement and inflated prices, heroin available for purchase by addicts is reportedly much more diluted than was true in the past * * * '[The] addict now, instead of getting a fairly pure heroin, which he did in the past, now gets a very much diluted version' Id. at 117 (testimony of James P. Hendrick, Acting As-

for the last four months before testifying he had been a patient at State Hospital No. 1 in Fulton for cure of his addiction and that he had had no narcotics for the last five months.

About a week before the shooting, Vaughn said defendant told him to "leave [Bailey] alone because he is a snitcher" to the police and F.B.I. Vaughn and Bailey used to take defendant with them on their stealing, but stopped doing so, to which defendant objected.

In the afternoon of January 10, 1965, Vaughn woke up around four o'clock and took his first shot of the day. Then Vaughn, Bailey and a woman, named Pat Townsend, age 25, with her two children, drove across the river to Collinsville, Illinois. There Bailey, Townsend and the children entered a department store. Bailey returned to the car in a few minutes, and showed Vaughn a handful of rings he had stolen. Vaughn and Bailey returned to St. Louis, to a house at 4259 Finney, where Bailey bought some powdered heroin from one Roosevelt Sain, and Bailey and Vaughn each took a shot of heroin in the arm. This was about 6:30 or 7:00 p.m. While Bailey and Vaughn were there, defendant Booth, Perry Pitchford, Fred Parker and a man called Junko also entered. Bailey had the rings in his hand and he and Parker talked about them. After about two hours Vaughn and Bailey went to Vaughn's house, where Pat Townsend again appeared. As they started to leave to get something to eat, the police arrested Bailey and Townsend. Townsend was released and she and Vaughn procured a bondsman for Bailey, who was released around 2:00 a.m. Then they returned to 4259 Finney so Bailey could buy some more heroin. Vaughn and Bailey went inside. Townsend stayed outside in the car.

Around 3:00 a.m., there were seven men in a living room about 12 ft. x 14 ft. in size on the first floor of 4259 Finney, including defendant, Vaughn, and deceased. Vaughn

had had a shot of heroin about fifteen minutes earlier and "had already taken off." According to Vaughn, he was seeing things clearly, all his senses were heightened, and this is what happened:

Fred Parker was lying on a couch. The defendant was sitting in the corner. Earl Davis was sitting in a chair in the opposite corner. Milton Gulley was opening the door. James Bailey was sitting on the couch, by Parker's head. Vaughn sat down at a table and picked up some cards. After about fifteen or twenty minutes the defendant said to Bailey "Give me those rings." Bailey said, "No." Defendant said, "Don't make me kill you about those rings. Give them to me." Then, in "a couple seconds," Vaughn heard a shot, which came from near the direction of defendant. By this time both defendant and Earl Davis were standing by a stove. Vaughn saw a forty-five gun in defendant's hand. In a few more seconds, there was a second shot, fired by defendant, standing, at Bailey, who was then standing at the corner, over the couch, by the window, about ten or twelve feet separating defendant and Bailey. Vaughn heard Bailey say, after the first and before the second shot, "Earl, you done shot me in my leg" and grab his leg. According to Vaughn, Bailey had nothing at any time in either hand, but grabbed his leg again with his right hand after the second shot. Vaughn testified he saw defendant fire a third and fourth shot at Bailey. Bailey had fallen on the couch and defendant took a step forward, aimed at the head, fired and Bailey fell over on the floor. Bailey made no move toward defendant at any time. The only thing he said to defendant was, "You don't have to do this."

Shortly after the shooting, Vaughn heard Fred Parker say that "Everybody in here seen Bailey with that pistol" and when they all came back in the room a few minutes later he (Vaughn) saw a small pistol, twenty-two caliber, at the finger tips of Bailey's

sistant Secretary of the Treasury).", from Narcotic Addiction, Criminal Re-

sponsibility, and Civil Commitment, Frankel, 1966 Utah L.R. 581, 587.

right hand. Vaughn had seen this pistol in Milton Gulley's possession a few days earlier. Roosevelt Sain removed the pistol, saying he "wasn't going to allow that". Several of them took Bailey to the hospital, where he died on the operating table. The autopsy showed gunshot wounds of the right cheek, right elbow, lower portion of right chest, left shoulder, two of the left cheek and an exit wound in the back of the head. There was no wound in the leg.

Later Vaughn saw the rings in defendant's possession and defendant wearing the ring deceased had on his finger at the time of the shooting.

The police found three spent "pellets" (caliber not determined) in the room and four forty-five cartridge casings. Defendant was arrested around 8:00 a.m., January 11, after having telephoned the police where he could be found, and at the time of arrest turned over a forty-five Colt automatic to the police. There was no evidence of comparison tests, if any, between the recovered pellets and casings and the gun produced by defendant.

Pat Townsend, who had known Bailey for about twelve years and had been living with him for the last three months before the shooting, testified she was waiting outside in the car, heard five shots and in about seven minutes Vaughn came out with the others. She went in the house with Vaughn and Sain. She saw Bailey on the couch and floor, in his right hand a gun, which was removed by Sain with the statement, "It's a damn shame. I can't let this go down like this." She testified she had known Vaughn about five months, that she did not take narcotics, but had seen Vaughn and Bailey shoot heroin in the vein, that she observed the way Vaughn walked, talked and his conduct on January 10 and 11; that he was his ordinary self, in control of his faculties, not irrational; that when he took narcotics he "would go in a nod, looked like he was going to sleep"; that he would "go in his nod" within three or four minutes, have his head down, and "he looks like he is

sleeping, but he don't be sleeping". She had talked to him many times when he was in this state, that he answered her and "talked in his normal sense".

On this aspect of his addiction Vaughn testified that the effect of a shot of heroin on him was that it "makes your wits sharper and you see things clearly", that he did not see things that were not there, that he was well aware of things going on around him and that the effect generally lasted three or four hours.

Vaughn was cross-examined thoroughly, but was not shaken on the details of the shooting, although counsel did obtain an admission the witness told a good friend, one John Charleston, he (Vaughn) was so under the influence of narcotics he did not know what happened, which statement the witness said on the stand was a lie. Vaughn also admitted five felony convictions.

Roosevelt Sain was called as a witness by the state, which sought unsuccessfully to examine him as a hostile witness. On cross-examination by defendant's counsel, he testified he saw the deceased pull a gun on defendant, following an argument, and after the first shot by deceased, the witness ran out of the room. He denied the statements attributed to him by Vaughn and Townsend. Fred Parker and Milton Gulley were called by the state, but failing to obtain permission to examine them as hostile witnesses, on the basis of their testimony at the coroner's inquest, the state did not question them further.

The defense was self-defense. For the defendant, Fred Parker testified he was asleep on the couch and was awakened by arguing between Bailey and defendant. Bailey pulled out a pistol and fired at defendant and the witness ran out of the room. Parker said on cross-examination his record was "as long as you can make it" and that "I'm guilty of all of it". He had known defendant for twenty years.

Milton Gulley testified to the argument between defendant and Bailey and seeing a

pistol in Bailey's hand. Gulley heard one shot and he, too, ran out the door. He had been convicted in 1956 of drug addiction.

Defendant and Earl Davis did not testify. Defendant's wife testified she had lived with Vaughn for two and a half years, had a child by him, but left him to marry defendant at a time when Vaughn was confined in the workhouse. She said Vaughn said he was going to get even with her and threatened defendant. She also said Vaughn told her he was in the toilet "nodding" when the shooting occurred, that he "had just taken off".

Defendant contends there is no substantial direct evidence in the case that defendant shot the deceased, because the only direct evidence on this point is that of Robert Vaughn, but this, says defendant, is not substantial evidence because Vaughn had been a drug addict for two years, was under the influence of a dose of heroin at the time of the events testified to, that everybody knows a drug addict under the present influence of a dose of heroin is not competent to act rationally or accurately record mentally, but is subject to hallucinations which he may later recount as actual events and the court should therefore take judicial notice the evidence given by Vaughn was not substantial.

None of the cases cited by defendant supports the proposition contended for, although the statement is made in Gaddy v. State Board of Registration for the Healing Arts (Mo.App.) 397 S.W.2d 347, 355, that:

" * * * it is common knowledge that narcotic drugs produce results other than the mere relief of pain and, in strange and diverse respects, influence and affect the reactions and judgment of users * * *"

The Gaddy case involved a doctor whose license was revoked. There was convincing proof of his addiction and the above quotation appears in the closing part of the opinion, where the court was pointing out that once the Board arrived at the conclusion the appellant was a narcotics addict the wisdom of its action in revoking his license could not be gainsaid, pointing out that if such people are a hazard on the highways, they certainly would be no less a hazard in the operating room. The question of appellant's reliability as a witness was not discussed and in fact, some of appellant's testimony was used against him as admissions, as substantial evidence of the fact admitted. The case is not authority for the proposition that we should take judicial notice here that the witness Vaughn's testimony is worthless.

In Markowitz v. Markowitz (Mo.App.) 290 S.W. 119, 122, the court seemed to assume that the testimony of a drug addict was unreliable. However, expert testimony had been admitted as to the reliability of a witness who was a drug addict and the point before the court was whether admission of this testimony was error. The court held it was not, that it went to the credibility of the witness. This is not the point before us now.

We do not hold that the effects which defendant says accompany heroin addiction are of such universal and common knowledge that they can be recognized and accepted as true without proof, so that we should take judicial notice that the evidence given by the witness Vaughn was not substantial. In fact, most of the authority is the other way. See annotation, Use of drugs as affecting competency or credibility of witness, 52 A.L.R.2d 848, 859 and 97 C.J.S. Witnesses § 59b, p. 454. In People v. Williams, 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549, with two judges dissenting, cert. den. 361 U.S. 920, 80 S.Ct. 266, 4 L.Ed. 2d 188, the Court of Appeals of New York affirmed a conviction of selling narcotics where the testimony as to the actual purchase depended solely on the testimony of a witness who had been a heroin addict for five years, taking it intravenously, as a "mainliner". Defendant sought to prove by a doctor (1) that mainliners addicted to heroin are unworthy of belief and (2) that, therefore, the witness was unworthy of belief. The opinion first declares it is not

permissible for an expert to testify to the veracity of a particular witness and then holds (159 N.E.2d 1. c. 554):

"* * * after long and serious deliberation * * * we hold inadmissible expert testimony that narcotics addicts of the same type as a witness are unworthy of belief in the absence of a clear and convincing showing to the full satisfaction of the Trial Judge that such is the consensus of medical and scientific opinion. The reliability of such a thesis must be clearly established before a jury may be subjected to its influence."

The court referred to Wigmore's statement (3 Wigmore Evidence, 3rd Ed. Sec. 875, p. 368) that "There must first be proof of general scientific recognition that they [scientific methods of determining credibility] are valid and feasible."

See also an earlier examination (1929) of the then existing authority on the subject by District Judge McDowell in Kelly v. Maryland Casualty Co. (D.C.W.D.Va.) 45 F.2d 782, involving a morphine addict and the effect of such addiction on a person's reliability as a witness. The portion of the opinion setting forth the views of various authorities on the subject is too long to quote, but Judge McDowell came to the conclusion that, as of that date, there was no consensus of medical opinion to the effect

that morphine addicts were usually abnormally untruthful in respect to matters not connected with their addiction.[2]

Defendant is in effect asking us to declare the truth of his proposition without requiring evidence from defendant, contending that his proposition is one as to which he will not be required to offer evidence. This would be an application of judicial notice, Wigmore on Evidence, Vol. IX, Sec. 2565, pp. 531–532, which we do not believe is warranted. We therefore overrule defendant's contention that we should hold a drug addict's testimony under the facts before us, is, per se, incompetent and inadmissible.

This is not the first case where a conviction has depended upon testimony of a drug addict. As would be expected there are many such cases involving convictions for unlawful possession or sale of narcotics.[3] But such convictions are not limited to narcotics cases. In Commonwealth v. Farrell, 319 Pa. 441, 181 A. 217, a murder conviction with a death sentence was upheld, where one of the important witnesses for the state was a confirmed opium user. In Commonwealth v. Price, 208 Pa. Super. 354, 222 A.2d 610, a conviction of arson was upheld where the only testimony implicating defendant was that of a convicted narcotics user, who was taking drugs

2. Of interest is the article by Drs. Fraser, Jones, Rosenberg and Thompson, on the staff of the National Institute of Mental Health, Addiction Research Center, Public Health Service Hospital, Lexington, Ky., entitled "Effects of Addiction to Intravenous Heroin on Patterns of Physical Activity in Man", Clinical Pharmacology and Therapeutics, Vol. 4, No. 2, pp. 188–196 (1963), wherein they conclude as follows (1. c. 196):

"Narcotic addicts consistently state that one of the important effects of narcotics is the production of a 'drive.' While this experiment confirms the existence of a temporary increase of activity which may be a reflection of such a 'drive,' it is short-lived and followed by depressed activity. The general clinical observations, the behavior and attitude of the patients, and their consistent per-

formance in the pursuit rotor tests indicate that the protracted reduced activity observed during addiction to heroin is not due to physical debility nor to psychomotor impairment, but to reduced responsiveness of the patients to ambient stimuli."

3. For example in addition to People v. Williams, supra, see Brown v. United States (C.A.9th Cal.) 222 F.2d 293; Tobar v. State, 32 Wis.2d 398, 145 N.W. 2d 782; People v. Sorrentini, 26 A.D. 2d 827, 273 N.Y.S.2d 981; Commonwealth v. Davis, 183 Pa.Super. 347, 132 A.2d 408; Commonwealth v. Aikens, 179 Pa.Super. 501, 118 A.2d 205; People v. Hill, 83 Ill.App.2d 116, 227 N.E.2d 117; People v. Dixon, 22 Ill.2d 513, 177 N.E. 2d 224.

at the time of the events to which he testified. See also United States v. Tannuzzo (C.A.2d N.Y.) 174 F.2d 177, conviction for transporting and conspiring to transport stolen fur coats in interstate commerce; Beland v. State, 86 Tex.Cr.R. 285, 217 S.W. 147, conviction for felony theft; People v. Nelson, 33 Ill.2d 48, 210 N.E.2d 212, conviction of murder.

Unless Vaughn's testimony was clearly unbelievable or impossible under the facts and circumstances (and we cannot say it was), it was for the jury to decide how much credence to give Vaughn's testimony. The fact of his addiction and that he had taken three injections of heroin, intravenously, within twelve hours or so, the last one only fifteen minutes before the events took place which he claimed he heard, saw, and remembered, was before the jury. Defendant's counsel argued all this to the jury, emphasizing that Vaughn could not be believed, that no reliance could be put in what he said and that defendant should not be convicted on the word of a dope addict. Nevertheless, the jury evidently believed Vaughn's testimony as to the shooting, as they had the right to do, and we cannot, therefore, say there is no substantial evidence on which to support the conviction.

Having overruled defendant's contention that we should declare as a matter of law that the testimony of Vaughn is not substantial and cannot support the conviction, we need not reach defendant's other contention, which is premised on the proposition that without Vaughn's direct testimony, there is no substantial circumstantial evidence in the case that defendant shot the deceased.

Examination of the record as required by rule 28.02, V.A.M.R. shows no error.

Judgment affirmed.

All concur.